UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------
JJS,

                Petitioner                19 Cv 2020 (VSB)(SN)

v.

W.S. PLILER, WARDEN**,**

                Respondent.
------------------------------------------------------

## AMENDED SUPPLEMENTAL PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241

### PRELIMINARY STATEMENT

Petitioner, JJS, by the undersigned counsel, submits this Amended Supplemental Petition seeking relief pursuant to 28 U.S.C. §2241.

As detailed forth herein, the Claims asserted in this Amended Supplemental Petition are based upon a violation of the Eighth Amendment of Constitution of the United States caused by Respondent's deliberate and indifferent refusal to provide medically necessary treatment, for gender dysphoria, to JJS.[1]

---

[1] JJS initially commenced the above captioned matter by filing a *pro se* petition (the "First Petition"). The Claims asserted in the First Petition are based upon the same circumstances as the Claims asserted by this Amended Supplemental Petition. As such, this Amended Supplemental Petition is intended to supplement and clarify the First Petition. All factual assertions in the First Petition, if not expressly reasserted herein, are incorporated by reference hereto.

While the First Petition was pending, JJS filed a second *pro se* petition, in this District, under docket number 20 cv 2033 (the "Second Petition"). The Second Petition, entitled "Emergency Writ of Habeas Corpus" was filed primarily in response to JJS contracting Covid-19 while in custody of Respondent and not receiving adequate medical treatment. This Amended Supplemental Petition does not reassert any of the Claims asserted in the Second Petition. However, to the extent they are relevant and provide support for the Claims asserted in this Amended Supplemental Petition, the factual assertions in the pleadings filed in regard to the Second Petition, are incorporated by reference hereto.

**PARTIES**

Petitioner, JJS, is currently detained and incarcerated at the Otisville Federal Correctional Institution located in Otisville, New York ("FCI Otisville"). FCI Otisville is a correctional facility for men. It only houses male inmates. JJS's inmate registration number is 15472-028. JJS is detained at FCI Otisville due to being sentenced a term of 180 months imprisonment. The sentence was imposed on September 13, 2017, pursuant to a criminal prosecution in the U.S. District Court for the Southern District of Indiana, under Indictment number 17 cr 67 (JMS) (the "Criminal Case"), by the Honorable Jane Magnus-Stinson, Chief Judge. The sentence was imposed following a plea of guilty pursuant to a plea agreement. Under the terms of the plea agreement, JJS pled guilty to Court I of the Indictment filed in the Criminal Case which charged JJS with a violation of 18 U.S.C. §2252(a)(2). JJS has been incarcerated at FCI Otisville since on or about March 27, 2018. JJS has been continuously incarcerated, in federal custody at FCI Otisville and other correctional facilities, since her arrest on or about November 8, 2016.

The Respondent named in the First Petition, WARDEN J. PERTUCCI, refers to James Pertucci ("Warden Pertucci") who is employed by the United States Bureau of Prisons (the "BOP"). At the time of the filing of the First Petition, Warden Pertucci was the warden of FCI Otisville. At present, Respondent W.S. PLILER, WARDEN is employed by the BOP and is the warden of FCI Otisville. W.S. PLILER, WARDEN is the successor to Warden Pertucci. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the caption of this matter has been amended to substitute W.S. PLILER, WARDEN as the named Respondent in this matter. Pursuant to 28 U.S.C. §2242, the person who is the warden of FCI Otisville is named as the Respondent in this matter due to the warden being the person who has custody over JJS.

**PERSONAL BACKGROUND**

JJS is fifty-seven years old.

JJS is a transgender woman.

At birth, JJS's assigned gender was male but her gender identity is female.

JJS suffers from gender dysphoria. Among other places, this diagnosis has been made by medical and other professionals at the *Eskenazi Women's Center for Excellence and Transgender Health* ("Eskenazi"), in Indianapolis, Indiana and acknowledged by the Health Services staff at FCI Otisville. As further detailed below, gender dysphoria is a serious psychological condition which requires medical and other treatment.

Prior to her arrest in the Criminal Case, JJS resided in Indiana and had been undergoing medical and other treatment, for gender dysphoria, at Eskenazi. The purpose of this treatment was to transition JJS's assigned gender from male to female. This treatment included but was not limited: taking 'chemical castration' medication; undergoing feminizing hormone therapy which, among other intended effects provided JJS with estrogen hormone levels which corresponded to her gender identity and caused her to develop feminine breasts; taking testosterone inhibitors which suppressed the production of testosterone; attending mental health counseling sessions; undergoing speech therapy; meeting with support groups; wearing women's attire; wearing a breast prosthesis; changing identity documents; and, wearing cosmetics. As a part of her transition plan, JJS had a surgical consultation scheduled, for on or about December 2016, wherein the scheduling of gender affirming surgery ("GAS"), which included an orchiectomy and vaginoplsty, would occur. However, the consultation, and GAS, did not occur due to JJS being arrested, and incarcerated, pursuant to being charged in the Criminal Case.

Even though JJS had not undergone GAS, her transition treatment had progressed to the point where her gender was medically, legally and socially classified as female.

By certification dated February 2, 2016, a medical doctor certified that JJS's gender had been permanently changed from male to female. (ECF. Doc. 2, p. 16).

The Sate of Indiana now recognizes JJS's assigned gender as female. On May 17, 2017, it issued a birth certificate to reflect this assigned designation. (ECF Doc. 2, p. 18).

The United States Social Security Administration classifies JJS's gender as female. (ECF Doc. 2, p. 20).

The Health Services staff at FCI Otisville and Warden Pertucci recognize JJS's gender as female.

At the time of her arrest on the Criminal Case, JJS's employer recognized her gender as female.

JJS's daughter recognizes JJS's gender as female.

The mental heath and medical professionals, therapist and support groups, who were consulting with and providing services to JJS, during the transition process and prior to her arrest in the Criminal Case, recognize her gender as female.

The District Court Judge who sentenced JJS in the Criminal Case recognizes her gender as female. This is evident by the Judgment of Conviction, issued in the Criminal Case, which made the following recommendation to the BOP:

> [JJS] be placed in medical facility with females at either FMC Lexington in Kentucky, or FMC Carswell in Fort Worth, Texas, and continue treatment for gender dysphoria. (ECF Doc. 13-2).

Apparently, the only person and entity who/which still consider JJS to be a male are Respondent and the BOP which persist in keeping JJS housed at FCI Otisville, a correctional facility for men, and refuse to transfer JJS to a correctional facility for women.

## GENERAL BACKGROUND: GENDER DYSPHORIA

When persons are born, their gender (either male or female) is assigned and noted on their birth certificate. This is referred to as their "assigned gender."

A person's "gender identity" refers to that person's internal sense of belonging to a particular gender without regard to the person's assigned gender. Everyone has a gender identity.

For most people, their gender identity is consistent with their assigned gender.

Transgender persons have a gender identity that is incongruent with their assigned gender.

"Gender dysphoria" is recognized as a psychological condition by the *American Medical Association* (the "AMA") and the *American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders* (Fifth Ed. 2013) ("DSM-5").

Gender dysphoria is not simply a mild discomfort with one's assigned sex. DSM-5 defines gender dysphoria as a marked incongruence between one's experienced/expressed gender (i.e., gender identity) and their assigned gender.

DSM-5 indicates that, in order to be clinically diagnosed with gender dysphoria, the period of incongruence must last at least six months and be associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning. In addition, it is manifested by at least two of the following six criteria:

(i)  a marked incongruence between one's gender identity and one's sex characteristics;

(ii) a strong desire to be rid of one's sex characteristics because of that incongruence;

(iii) a strong desire for the sex characteristics of the other gender;

(iv) a strong desire to be of another gender;

(v) a strong desire to be treated as another gender; and

(vi) a strong conviction that one's feelings and reactions are typical of another gender.

The *World Professional Association for Transgender Health* ("WPATH") is a nonprofit, multi-disciplinary, professional association dedicated to the treatment of gender dysphoria. WPATH is recognized as the worldwide leading professional organization devoted to the understanding and treatment of gender dysphoria.

WPATH promulgates and updates the *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People* (the "Standards of Care" or "SOC"). The current version of the Standards of Care (7th) was released during 2011.[2]

The Standards of Care have established mental health, medical and surgical treatment standards for persons suffering from gender dysphoria. These standards are recognized and accepted within the medical, psychological and other professional communities. They represent a consensus of expert opinions among professionals in these fields based their expertise, clinical work and research. The Standards of Care are widely recognized in these communities as the highest authoritative standards for the provision of transgender healthcare. Notably, federal Courts of Appeals have acknowledged that the Standards of Care are internationally recognized guidelines for

---

[2] https://www.wpath.org/publications/soc

the treatment of individuals with gender dysphoria. *See e.g., Edmo v. Corizon, Inc.*, 935 F.3d 757, 769-772 (9th Cir. 2019); *De'lonta v. Johnson*, 708 F.3d 520, 522 23 (4th Cir. 2013).

The Standards of Care list the following options for psychological and medical treatment of gender dysphoria:

- Changes in gender expression and role, which may involve living part time or full time in another gender role, consistent with one's gender identity;

- Hormone therapy to feminize the body;

- [GAS] Surgery to change primary and/or secondary sex characteristics (e.g. breasts/chest, external and/or internal genitalia, facial features, body contouring); and/or

- Psychotherapy for purposes such as: exploring gender identity, role, and expression; addressing the negative impact of gender dysphoria and stigma on mental health; alleviated internalized transphobia; enhancing social and peer support; improving body image; and/or, promoting resilience.

The Standards of Care indicate the scope of these treatments, and the order in which they take place, may differ from person to person.

The Standards of Care list the following options for social support and changes in gender expression:

- peer support groups;

- voice and communication therapy aimed toward facilitating gender identity comfort;

- hair removal;

- outward-appearance aids such as padding or prostheses; and,

- name and/or gender marker changes on identity documents.

The Standards of Care indicate these options can be employed in addition to the above referenced psychological and medical treatment for gender dysphoria.

When gender dysphoria is effectively treated by the Standards of Care, its symptoms can be effectively addressed and the condition can be considered to be cured.

If not properly treated by the Standards of Care, gender dysphoria can cause transgender persons to suffer from the inability to function effectively within school, occupational or social settings. It can cause them to suffer from clinically significant depression, anxiety, mental impairment, substance-related disorders, infliction of self-harm, the impulse to engage in self-castration and suicide. High levels of stigmatization, discrimination, and victimization, which are often suffered by transgender persons, can cause and exacerbate these conditions.

The suicide rates (both ideation and attempt) of transgender persons are extremely high compared to the general population. One study found that persons who suffer from gender dysphoria had a 48.3% rate of suicidal ideation and 23.8% rate of attempted suicide.[3] By comparison, the worldwide suicide rate is 1.4%.[4]

The Standards of Care state they apply in institutional environments such as prisons:

> The SOC in their entirety apply to all transsexual, transgender, and gender nonconforming people, irrespective of their housing situation. People should not be discriminated against in their access to appropriate health care based on where they live, including institutional environments such as prisons …. Health care for transsexual, transgender, and gender nonconforming people living in an institutional

---

[3] Garcia-Vega, E., *HIH, National Library of Medicine, Suicidal ideation and suicide attempts in persons with gender dysphoria*
https://pubmed.ncbi.nlm.nih.gov/30009750/

[4] *World Health Organization, Suicide Data*
https://www.who.int/teams/mental-health-and-substance-use/suicide-data#:~:text Suicide%20ac counted%20for%201.4%25%20of,cause%20of%20death%20in%202016.

environment should mirror that which would be available to them if they were living in a non-institutional setting within the same community.

The Standards of Care state that "all elements of assessment and treatment as described in the SOC can be provided to people living in institutions" and "access to these medically necessary treatments should not be denied on the basis of institutionalization or housing arrangements."

The Standards of Care provide that health care for transgender individuals living in an institutional environment should mirror that which would be available to them if they were living in a non-institutional setting within the same community.

The Standards of Care provide that transgender inmates should be assessed individually and given appropriate treatment and provided with a fair and tolerant climate, which may consist of outward expression of "one's internal sense of gender identity" including hormone therapy and/or sex reassignment surgery, and social role transition, including access to gender-affirming canteen items.

The Standards of Care find that "denial of needed changes in gender role or access to treatments, including sex reassignment surgery, on the basis of residence in an institution are not reasonable accommodations under the SOC."

The National Commission on Correctional Healthcare, which was established by the AMA, recommends that medical care for transgender prisoners with gender dysphoria should follow the Standards of Care.

The Prison Rape Elimination Act, 42 U.S.C. § 15601 *et seq*. ("PREA"), establishes a zero-tolerance standard against sexual abuse in adult prisons and other confinement centers. The Act requires agencies to comply with national standards to eliminate sexual abuse and recognizes that transgender inmates face elevated risks of being victimized. As such, placement of transgender

inmates in prisons which do not conform to their gender identity is contrary to the objective of PREA as placement in such prisons increases the risk for victimization.

### THE DENIAL OF TREATMENT FOR GENDER DYSPHORIA

The Health Services staff at FCI Otisville acknowledge that JJS is the first transgender inmate to be housed at FCI Otisville who suffers from gender dysphoria and who requires, and needs, GAS.

The Health Services staff are not properly equipped in a manner sufficient to treat JJS for gender dysphoria in accordance with the Standards of Care including provision of GAS and all other attendant procedures.

While incarcerated at FCI Otisville, despite requests by JJS, Respondent, and the BOP, have wilfully, intentionally and indifferently refused to provide all needed medically necessary treatment, for gender dysphoria, including GAS, to JJS in accordance with the Standards of Care.

Respondent, and the BOP, are incapable of providing all medically necessary treatment to JJS, including GAS, in accordance with the Standards of Care

### THE DENIAL OF PLACEMENT IN A WOMEN'S CORRECTIONAL FACILITY

The housing of JJS in a correctional facility for women is medially necessary for treatment of gender dysphoria and in accordance with the Standards of Care as it takes into account JJS's revised assigned gender, gender identity, role, physical status and dignity.

Primary placement of JJS in a correctional facility for men, based upon JJS's prior assigned gender, was not in accordance with the Standards of Care. Continued housing of JJS, in a

correctional facility for men based upon JJS's prior assigned gender, is not in accordance with the Standards of Care.

While incarcerated at FCI Otisville, despite requests by JJS, Respondent, and the BOP, have wilfully, intentionally and indifferently refused to transfer JJS to a correctional facility for women.

## ADMINISTRATIVE APPEALS

**FIRST ADMINISTRATIVE APPEAL**
Ground raised:  Transfer to a correctional facility for women & provision of GAS surgery
Level of appeal:  Informal Request for Resolution
Result:  Denied

**SECOND ADMINISTRATIVE APPEAL**
Ground raised:  Transfer to a correctional facility for women & provision of GAS surgery
Level of appeal:  Request for Administrative Remedy
Result:  Denied

**THIRD ADMINISTRATIVE APPEAL**
Ground raised:  Transfer to a correctional facility for women & provision of GAS surgery
Level of appeal:  Submission of Regional Administrative Remedy Appeal
Result:  Denied

**FOURTH ADMINISTRATIVE APPEAL**
Ground raised:  Transfer to a correctional facility for women & provision of GAS surgery
Level of appeal:  Submission of Appeal to BOP central office
Result:  Denied

Any further attempts via the administrative grievance process will be futile.

During the course of the administrative appeal process, JJS has been informed that the BOP does not perform GAS. Accordingly, any additional attempts at further administrative appeals for the provision of GAS will be futile.

During the course of the administrative appeal process, JJS has been informed that the authority and decision to initially place JJS in a correctional facility for men, and to transfer JJS to

a correctional facility for women, is solely held by the BOP Transgender Executive Committee ("TEC").

JJS has requested she be transferred to a correctional facility for women. In addition, on behalf of JJS, Warden Pertucci requested the TEC approve a transfer of JJS from FCI Otisville to a correctional facility for women.

Sections 5 & 8 of the BOP TEC Manual require that, in determining the initial placement of a transgender inmate and deciding whether to transfer a transgender inmate to another facility, "the agency shall consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems." It specifies the following factors must be considered:

- The TEC will use biological sex as the initial determination for designation;

- The TEC will consider the health and safety of the transgender inmate, exploring appropriate options available to assist with mitigating risk to the transgender offender, to include but not limited to cell and/or unit assignments, application of management variables, programming missions of the facility, re-designation to another facility of the same sex, etc.;

- The TEC will also consider factors specific to the transgender inmate, such as behavioral history, overall demeanor, program participation, and likely interactions with other inmates; and

- The TEC will consider whether placement would threaten the management and security of the institution and/or pose a risk to other inmates in the institution (e.g., considering inmates with histories of trauma, privacy concerns, etc.).

The TEC manual states "the designation to a facility of the inmate's identified gender would be appropriate only in rare cases after consideration of all of the above factors and where there has been significant progress towards transition as demonstrated by medical and mental health history, as well as positive institution adjustments."

The minutes of the TEC meetings, for both the designation and transfer of JJS, demonstrate the decisions of the TEC are not in compliance with the TEC Manual. The minutes are devoid of any indication that aforementioned requisite factors were considered. The minutes do not indicate any consideration was given to the fact JJS has undergone significant progress towards transition as confirmed by her medical and mental health history, documented in BOP records, as well as positive institutional adjustments made by JJS. Instead, the TEC minutes indicate the decision to house JJS in a correctional facility for men was summarily done, by simply stating JJS, was to be designated in a men's facility "commensurate with security and care level."

Regarding JJS's request for a transfer, the TEC Minutes are similarly devoid of any indication that the aforementioned requisite factors were considered. The minutes do not indicate any consideration was given to the fact JJS has undergone significant progress towards transition as confirmed by her medical and mental health history, documented in BOP records, as well as positive institutional adjustments made by JJS. Instead, the TEC minutes indicate the decision to continue housing JJS in a correctional facility for men was summarily done, simply stating the decision was solely "based upon offense and conduct" and "transfer to a female facility not considered at this time."

The denial of a transfer of JJS to a correctional facility for women, purportedly based upon the "offense and conduct," represents a deliberate indifference to JJS's medical and psychological need for gender dysphoria treatment. Notably, there are offenders in correctional facilities for women who have committed the same "offense and conduct" (distribution of child pornography) as JJS. Moreover, among other factors, the offense and conduct of JJS did not involve violence. As

13

such, there are no safety concerns which would warrant placement of JJS in a correctional facility for men instead of a correctional facility for woman.[5]

Placement of JJS in a correctional facility for men exacerbates the anxiety, and other mental health conditions, caused by the gender dysphoria suffered by JJS, as it causes her to live within a prison population of inmates whose gender identity is different from JJS. This placement represents a deliberate disregard of the medical and psychological care and treatment needed by JJS.

Based upon the foregoing, all administrative remedies have been exhausted and, to the extent any other administrative remedies are available, pursuit of them will be futile.

## CLAIMS ASSERTED IN THIS PETITION

### FIRST CLAIM

### DENIAL OF TREATMENT FOR GENDER DYSPHORIA

Acting with deliberate indifference to an inmate's serious medical and psychological needs, including the need for treatment for gender dysphoria, constitutes a violation of the Eighth Amendment of the U.S. Constitution which prohibits the infliction of cruel and unusual punishment.

Respondent, and the BOP, have deliberately and indifferently refused to provide GAS to JJS.

Pursuant to the Standards of Care, JJS's condition, and JJS's transition, GAS is medically necessary treatment needed by JJS as treatment for gender dysphoria.

JJS is being held in custody in violation of the Constitution and laws of the United States.

---

[5] Presumably, the TEC minutes' reference to "conduct" does not refer to JJS's prison conduct record which is exemplary.

Respondent, and the BOP, do not intend to discontinue their ongoing violation of the Constitution and laws of the United States.

Release of JJS from custody is the appropriate remedy.

## SECOND CLAIM

## DENIAL OF PLACEMENT IN A CORRECTIONAL FACILITY FOR WOMEN

Acting with deliberate indifference to an inmate's serious medical and psychological needs, including the need for treatment for gender dysphoria, constitutes a violation of the Eighth Amendment of the U.S. Constitution which prohibits the infliction of cruel and unusual punishment.

Respondent, and the BOP, have deliberately and indifferently refused to house JJS in a correctional facility for women.

Pursuant to the Standards of Care, JJS's condition, and JJS's transition, placement of JJS in a correctional facility with inmates who have the same gender, and gender identity, as JJS, is medically necessary treatment needed by JJS for gender dysphoria.

JJS is being held in custody in violation of the Constitution and laws of the United States.

Respondent, and the BOP, do not intend to discontinue their ongoing violation of the Constitution and laws of the United States.

Release of JJS from custody is the appropriate remedy.

## PREVIOUS PETITIONS

Other than the First and Second Petitions, as supplemented herein, no previous petitions for habeas corpus under 28 U.S.C. §§ 2241 or 2255 have been filed with respect to the Claims raised in this Petition.

**WHEREFORE**, JJS prays that the Court issue the following relief:

(1) On the First Claim, issuance of an Order which directs Respondent to release JJS from confinement.

(2) On the Second Claim, issuance of an Order which directs Respondent to release JJS from confinement.

(3) In the alternative, on the First and Second Claims, issuance of Orders directing Respondent to provide all medically and psychologically necessary treatment to JJS, for treatment of gender dysphoria, including but not limited to GAS, and all attendant procedures, and to transfer JJS to a correctional facility for women.

(4) On the First and Second Claims, issuance of an Order which grants any other relief to which is just and proper to which JJS may be entitled in this proceeding.

Dated:      June 3, 2021
            Bayside, NY

Respectfully submitted,
/s/
Jeffrey G. Pittell
Attorney for Petitioner, JJS
*Maher & Pittell, LLP*
42-40 Bell Blvd, Ste. 302
Bayside, NY 11361
(516) 829-2299
jp@jpittell.com