UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

JJS,

                                        Petitioner,

                 -against-

W.S. PLILER,

                                        Respondent.

-----------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __ 8/3/2022

19-CV-02020 (VSB)(SN)

**REPORT AND
RECOMMENDATION**

SARAH NETBURN, United States Magistrate Judge.

TO THE HONORABLE VERNON S. BRODERICK:

Petitioner JJS is a transgender woman who is currently in the custody of the U.S. Bureau

of Prisons and designated to a men's facility. She filed a petition for a writ of habeas corpus,

pursuant to 28 U.S.C. § 2241, seeking transfer to a women's facility and an order compelling

BOP to provide her gender affirming surgery. After considering the evidence and relevant

authority, I recommend that the Court grant Petitioner's writ in part and order that she be

transferred immediately to a women's facility.[1]

## FACTUAL BACKGROUND

### I.     Gender Dysphoria and Standards of Care

At birth, people are typically assigned a gender. That assigned gender usually correlates

with the person's external physical characteristics and genitalia: someone with male

---

[1] Petitioner filed this case *pro se*. The Court later appointed pro bono counsel from the Criminal Justice
Act Habeas Panel and held a two-day evidentiary hearing on June 28 and 29, 2022. The parties submitted
written testimony from Dr. Janine Fogel for Petitioner, and Warden James Petrucci for the BOP.
Petitioner and Dr. Jennifer Bowe for Petitioner, and Dr. Kristin Willert and Jenna Epplin for the BOP,
testified in person.

characteristics is thought to be a man, and someone with female characteristics is thought to be a woman. For many, the gender they were assigned at birth corresponds to their gender identity—that is, the gender they know and perceive themselves to belong to. But "[w]hen a human's internal sense of belonging to a particular gender—also known as gender identity—is different than the identity assigned at birth to that individual, he or she is transgender." Iglesias v. Fed. Bureau of Prisons, No. 19-cv-415 (NJR), 2021 WL 6112790, at *2 (S.D. Ill. Dec. 27, 2021), modified, 2022 WL 1136629 (S.D. Ill. Apr. 18, 2022).

Some transgender people experience gender dysphoria, a serious medical condition defined as "distress that accompanies the incongruence between one's experienced and expressed gender and one's assigned or natal gender." Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 822 (5th ed. 2013). Gender dysphoria manifests as at least two of the following: (i) "marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics"; (ii) "strong desire to be rid of one's primary and/or secondary sex characteristics because of" said "marked incongruence"; (iii) "strong desire for the primary and/or secondary sex characteristics of the other gender"; (iv) "strong desire to be of the other gender"; (v) "strong desire to be treated as the other gender"; and (vi) "strong conviction that one has the typical feelings and reactions of the other gender." Id. § 302.85. The condition "is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning." Id.

"Most courts agree" that the World Professional Association for Transgender Health Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People ("WPATH Standards of Care") "are the internationally recognized guidelines for the treatment of individuals with gender dysphoria." Edmo v. Corizon, Inc., 935 F.3d 757, 769 (9th

Cir. 2019) (collecting cases); see Cruz v. Zucker, 195 F. Supp. 3d 554, 563 n.4 (S.D.N.Y.)

(putting "significant weight on the WPATH Standards of Care"), on reconsideration on other

grounds, 218 F. Supp. 3d 246 (S.D.N.Y. 2016). Similarly, many of the "major" medical and

mental health groups in the United States "recognize the WPATH Standards of Care as

representing the consensus of the medical and mental health communities regarding the

appropriate treatment for transgender and gender dysphoric individuals." Edmo, 935 F.3d at 769;

see Iglesias, 2021 WL 6112790, at *2 ("[T]he American Medical Association, the Endocrine

Society, the American Psychological Association, the American Psychiatric Association, the

World Health Organization, the American Academy of Family Physicians, the American Public

Health Association, the National Association of Social Workers, the American College of

Obstetrics and Gynecology, and the American Society of Plastic Surgeons endorse all the

protocols in accordance with WPATH's Standards of Care.").

　　　According to the most current version of the WPATH Standards of Care, released in

2011, the "number and type" of therapeutic interventions applied for gender dysphoria differ

from person to person but include: changes in gender expression and role, which may involve

living part or full time in a gender role consistent with one's gender identity; hormone therapy;

surgery to change primary and/or secondary sex characteristics to align with one's gender

identity (i.e., gender affirming surgery, or "GAS"); and psychotherapy. World Pro. Ass'n for

Transgender Health, Standards of Care for the Health of Transsexual, Transgender, and Gender

Nonconforming People 9-10 (7th ed. 2011) (hereinafter Standards of Care).[2] Underscoring the

flexibility of the Standards of Care and the need to apply them on an individualized basis,

WPATH notes that while many transgender people find "comfort with their gender identity, role,

---

[2] Available at https://www.wpath.org/media/cms/Documents/SOC%20v7/SOC%20V7_English.pdf.

and expression without surgery, for many others [gender affirming] surgery is essential and medically necessary to alleviate their gender dysphoria." Id. at 54. Generally, WPATH recommends that GAS not be performed on a person's genitals until they have lived continuously for at least 12 months in the gender role that is congruent with their gender identity. Id. at 21.

BOP uses the WPATH Standards of Care as a "guide" but does not follow them "in entirety" because the standards were not developed "specifically for correctional settings." Iglesias, 2021 WL 6112790, at *2. WPATH recommends, however, that "[h]ealth care for transsexual, transgender, and gender nonconforming people living in an institutional environment should mirror that which would be available to them if they were living in a non-institutional setting within the same community." Standards of Care at 67. "Housing . . . for transsexual, transgender, and gender nonconforming people living in institutions should take into account their gender identity and role, physical status, dignity, and personal safety." Id. at 68. Finally, WPATH cautions: "Institutions where transsexual, transgender, and gender nonconforming people reside and receive health care should monitor for a tolerant and positive climate to ensure that residents are not under attack by staff or other residents." Id. At the evidentiary hearing, BOP witness Jenna Epplin agreed that the Standards of Care are "appropriate treatment" for gender dysphoria. ECF No. 68 (June 28, 2022 Tr.) 163:11-17.

## II.   BOP's Policies and Procedures

### A.   Designation and Transfer of Transgender Prisoners and GAS

On January 18, 2017, the BOP released a Transgender Offender Manual (the "Manual") to "ensure the [BOP] properly identifies, tracks, and provides services to the transgender population." Fed. Bureau of Prisons, Program Statement 5200.04, Transgender Offender Manual

4

1 (2017).[3] The 2017 Manual established the Transgender Executive Council ("TEC") "to offer advice and guidance on unique measures related to treatment and management needs of transgender inmates and/or inmates with [gender dysphoria], including designation issues." Id. at 4. The Manual incorporated the Prison Rape Elimination Act (PREA) regulations on the management of transgender inmates into the BOP's procedure for designating inmate placement:

> In deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates . . . the agency shall consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems.

Id. at 5 (citing 28 C.F.R. § 115.42(c)).

Under the terms of the 2017 Manual, the TEC "will recommend housing by gender identity when appropriate." Id. at 6. In making that determination, the TEC considers: "an inmate's security level, criminal and disciplinary history, current gender expression, medical and mental health needs/information, vulnerability to sexual victimization, and likelihood of perpetrating abuse." Id.

The BOP revised the Manual in 2018. See Fed. Bureau of Prisons, Program Statement 5200.04 CN-1, Transgender Offender Manual 1 (2018).[4] The most significant change was to require the TEC to "use biological sex as the initial determination for designation" or transfer. Id. at 10. Under these revised guidelines, "designation to a facility of the inmate's identified gender would be appropriate only in rare cases after consideration of all of the . . . factors and where there has been significant progress towards transition as demonstrated by medical and mental health history, as well as positive institution adjustments." Id. at 10-11. The BOP expanded the list of factors that the TEC was to consider to include "the health and safety of the transgender

---

[3] Available at https://www.bop.gov/policy/progstat/5200.04.pdf.
[4] Available at ECF No. 13-5.

inmate, exploring appropriate options available to assist with mitigating risk to the transgender offender, to include but not limited to cell and/or unit assignments, application of management variables, programming missions of the facility, etc.," "factors specific to the transgender inmate, such as behavioral history, overall demeanor, and likely interactions with other inmates," and "whether placement would threaten the management and security of the institution and/or pose a risk to other inmates in the institution (e.g., considering inmates with histories of trauma, privacy concerns, etc.)." Id. at 10.

The BOP revised the Manual again in 2022. See Fed. Bureau of Prisons, Program Statement 5200.08, Transgender Offender Manual (2022) (hereinafter 2022 TEC Manual).[5] The 2022 Manual removed the 2018 Manual's requirement that the TEC use biological sex as its initial determination for designation or transfer. Id. at 5-7.

In its revisions, the BOP restored the 2017 list of factors as the key factors that the TEC is to consider when determining a transgender person's facility designation. The 2022 Manual again directs the TEC to consider "factors including, but not limited to, an inmate's security level, criminal and behavioral/ disciplinary history, current gender expression, programming, medical, and mental health needs/information, vulnerability to sexual victimization, and likelihood of perpetrating abuse." Id. at 6. The TEC must also consider "the wellbeing of all inmates while exploring appropriate options available to assist with mitigating risk to the inmate, to include but not limited to cell and/or unit assignments, application of management variables, programming missions of the facility, and security of the institution." Id.

In making housing determinations, the 2022 Manual directs that a transgender person's "own views with respect to his/her own safety must be given serious consideration." Id. In

---

[5] https://www.bop.gov/policy/progstat/5200-08-cn-1.pdf.

reviewing the relevant factors, the TEC "will consider on a case-by-case basis that the inmate placement does not jeopardize the inmate's wellbeing and does not present management or security concerns." Id.

Unlike the 2017 and 2018 Manuals, the 2022 Manual also contains a provision specific to "situations where the transfer request is related to progressing the individual inmate's transition." Id. at 7. The TEC is to consider such cases after the Warden of the individual's current facility submits documentation to the TEC showing the person has "met the minimum standards of compliance with programs, medications and mental health treatment, and [is] meeting hormone goal levels." Id. Individuals "may be considered for submission on a case-by-case basis by the Warden, as appropriate." Id.

The 2022 Manual recognized for the first time that gender affirming surgery may be medically appropriate. "[S]urgery may be the final stage in the transition process and is generally considered only after one year of clear conduct and compliance with mental health, medical, and programming services at the gender affirming facility." Id. at 9. In other words, while there is technically no requirement that a transgender prisoner live at a facility aligned with their gender for a year before the BOP will consider a request for GAS, in practice, the BOP will not consider such requests until they do. Testimony at the evidentiary hearing confirmed this. June 28, 2022 Tr. 122:7-18, 122:25-123:9.

The TEC currently consists of senior level staff members from the Women and Special Populations Branch, the Psychology Services Branch, Health Services Division, and the Designation and Sentence Computation Center and meets a "minimum of monthly to offer advice and guidance on unique measures related to treatment and management needs of transgender inmates and/or inmates with [gender dysphoria], including training, designation

issues, and reviewing all transfers for approval." 2022 TEC Manual at 4. The TEC is the BOP's "official decision-making body on all issues affecting the transgender population." Id.

### B.     Sex Offender Management Programming

The BOP offers two kinds of sex offender management programs ("SOMP") to prisoners with a history of sexual offenses.[6] All SOMPs are voluntary. The residential SOMP involves "high intensity" group programming for 12 to 18 months, five days per week, and requires that participants live in a residential housing unit with other participants. The residential SOMP is offered only at USP Marion and FMC Devens, which are both men's facilities. The non-residential SOMP consists of outpatient group treatment for 9 to 12 months, two to three times per week, and is offered at men's and women's facilities (e.g., FMC Carswell). See June 28, 2022 Tr. 60:5-19. Ten BOP facilities in total offer residential or non-residential SOMP. Id. 61:23-25.

If a prisoner wants to participate in SOMP, the BOP conducts a risk assessment to appraise "each treatment participant's recidivism risk level" to determine whether the residential or non-residential program best meets that person's treatment needs. Fed. Bureau of Prisons, Program Statement 5324.10, Sex Offender Programs 14 (2013).[7] The residential SOMP is designed for high-risk prisoners, and the non-residential SOMP is for low- to moderate-risk prisoners. Id. To assess a prisoner's risk, "SOMP staff rely on actuarial risk assessment measures coupled with consideration of other clinically relevant factors." Id. at 8-9. SOMP staff review relevant documentation, score an actuarial instrument called Static-99R, and sometimes interview the person being assessed. The non-residential SOMP is considered appropriate for

---

[6] See Fed. Bureau of Prisons, Sex Offenders,
https://www.bop.gov/inmates/custody_and_care/sex_offenders.jsp (last visited June 30, 2022).
[7] Available at https://www.bop.gov/policy/progstat/5324_010.pdf.

people who cannot be scored by Static-99R or who are deemed by SOMP staff to be appropriate for a moderate-intensity program based on their sex offense or criminal history and other risk factors. Id. at 22.

Static-99R uses a ten-item checklist to assess risk of recidivism for adult men with a history of sexual offenses. See June 28, 2022 Tr. 64:2-16; see also SAARNA, Static-99R Users, https://saarna.org/static-99/ (last visited June 30, 2022). It is not dynamic, which means it does not consider the age of the sexual offense, previous participation in sex offender treatment, or any other intervening changes in the person's life since the offense. June 28, 2022 Tr. 78:20-21, 79:18-22, 79:23-80:2. According to testimony at the evidentiary hearing, the BOP uses Static-99R to evaluate only prisoners who have a penis, including transgender prisoners. Id. 65:6-14. Transgender prisoners who are anatomically male are scored the same way as cisgender male prisoners. Static-99R does not take hormonal changes into account. Id. 65:15-22. Static-99R instrument is not validated for use on women, and at least one study has found that it does not predict sexual recidivism among women.[8] Women in BOP custody who have a history of sexual offenses are considered low-risk, and BOP offers only non-residential treatment at women's facilities. Id. 83:4-13.

As of June 28, 2022, there were nine transgender women in BOP custody participating in residential SOMP (in men's facilities). Id. 84:13-85:12. There were no transgender women participating in non-residential SOMP in women's facilities, but there is no BOP policy prohibiting them from doing so. Id. 84:16-85:4.

---

[8] See Ethan Marshall et al., The Static-99R Is Not Valid for Women: Predictive Validity in 739 Females Who Have Sexually Offended, 33 Sexual Abuse (Issue 6) 631 (2021).

### III.    JJS's Early Years

Petitioner is 58 years old and was born and grew up in rural Indiana. ECF No. 70 (June 29, 2022 Tr.) 4:4-9. She started noticing that her gender identity did not match her gender assigned at birth at age 5, when she realized that it "wasn't right" for her to have a penis. Id. 8:5-18. As a child, Petitioner would hide in the bathroom with the door locked and wear her sister's clothes, shave her legs, and wear makeup, but did not express her gender identity outwardly. Id. 15:19-16:2. Other children called her "gay" and associated slurs because, when she was around 4 years old, a couple of older boys exposed themselves to her and forced her to perform oral sex on them. Id. 16:24-17:6. When Petitioner was 12 years old, an older boy (around 17 years old), picked her up in his car while she was on a walk, took her to a secluded area, performed oral sex on her, beat her up, and left her in a ditch. Id. 17:16-18:5. Petitioner did not receive any mental health counseling after the attack. Id. 18:15-17.

She attended high school until her junior year, then quit and joined the Navy, where she received her GED, and subsequently earned a four-year bachelor's degree. Id. 4:10-15, 5:3-18. In the Navy, Petitioner wore women's dungaree shirts in secret but otherwise did not outwardly express her gender identity. Id. 19:25-20:7. While in the Navy, she was again sexually assaulted: after the yeoman for Petitioner's executive officer helped her get a promotion, he anally raped her. Id. 21:9-22:13. She never reported the assault because he told her that she would be court-martialed or dishonorably discharged if she did. Id. 22:14-22. Petitioner's work performance deteriorated, id. 23:20-24:7, and she ultimately did "everything that [she] could to get out, to go home," id. 24:19-20. She was discharged at 19 and did not have stable housing for three months. She then lived with a boyfriend, was briefly married, and subsequently spent 1985-86 in prison for burglary and arson of an unoccupied dwelling. Id. 5:19-6:12, 27:25-28:2. Petitioner described

herself as an alcoholic who was "constantly drunk," starting at age 12 until she was arrested in 1993 at age 29. Id. 14:16-15:6.

After Petitioner got out of prison in 1986, she moved in with her then-girlfriend, with whom she has a daughter. Id. 30:16-31:2. At that time, Petitioner wore women's underwear in secret: "It was the only thing that I could do. I mean I couldn't do makeup, I couldn't do hair, I couldn't do dresses, I couldn't do shoes, jewelry, I mean there was nothing that I could, I couldn't act like a girl, there was nothing I could do." Id. 33:13-17.

**IV.    State Custody and Rehabilitation**

In 1994, Petitioner pleaded guilty in two Indiana state cases: to child molestation of a nine-year-old boy (a Class B felony) in the first case, and to rape of a seventeen-year-old girl (a Class B felony) and criminal deviate conduct (a Class B felony) in the second case. See ECF No. 13-3 (State Court Documents). She was sentenced to two 18-year terms in state prison to run consecutively. Id. She was released on parole after 18 years but violated the terms of her parole (for having internet access in her apartment) and was returned to prison for six years. She was finally released from state prison in 2015. June 29, 2022 Tr. 6:22-7:2, 41:23-42:5.

While in state prison, Petitioner participated in a substance abuse treatment program for seven years, regularly saw a psychologist, and began taking anti-depressant medication. Id. 37:11-21. She also participated in Indiana's sex offender treatment program, known as Sex Offender Management and Monitoring (SOMM). Id. 37:22-38:18. The program lasted for 18 months and included a 3-month orientation phase as well as a group therapy and treatment phase. Id. 39:2-40:15. Petitioner participated in both phases until she was paroled after 15 months of programming. Id. 40:16-21.

Petitioner continued to attend SOMM group therapy as a condition of her parole. Id. 44:6-20. She also found a counselor at the Midtown Mental Health Center in Indiana, where she went weekly to treat her gender dysphoria, post-traumatic stress disorder, depression, and anxiety. Id. 45:17-19. Additionally, she voluntarily sought injections of Depo-Provera to lower her testosterone levels because she had a history of sex offenses and "wanted to make sure that that never happened again." Id. 46:5-22, 48:4-6. Depo-Provera is commonly referred to as "chemical castration."[9] She testified about this decision: "[O]n top of counseling and everything else I just wanted to make sure that I had done everything that I could possibly do to be successful." Id. 48:8-11. She took Depo-Provera for about six months; then she started taking hormone treatment to aid her gender transition, and her medical team determined that continuing to take Depo-Provera would be redundant. Id. 50:11-24.

## V.    Gender Dysphoria Diagnosis and Treatment

Petitioner was diagnosed with gender dysphoria at the Midtown Mental Health Center at the age of 51. She testified that it was a "relief" to have the diagnosis as an explanation for her feelings: "I have never been comfortable as a male. Everything that I've ever tried to do as a male has been a failure. I'm – I hate my body, you know, people see a 6'2" tattooed prisoner, I see a girl." Id. 9:13-19, 49:11-17. Petitioner has regularly experienced symptoms associated with gender dysphoria, including depression, anxiety, suicidal ideation, and self-mutilation. Id. 10:8-21 ("Q: And have you at various points in your life experienced any of these symptoms? A: Daily."). She explained that she had thought about committing suicide but had never attempted to kill herself due to her religious convictions and because of her daughter. Id. 11:9-22. When Petitioner was a child, she tried to cut off her own penis with a pair of scissors but could not "get

---

[9] See Walter J. Meyer III et al., Depro Provera Treatment for Sex Offending Behavior: An Evaluation of Outcome, 20 Bull. Am. Acad. Psychiatry L. 249 (1992).

the courage to . . . cut [herself]," and had not attempted self-mutilation since because she did not want to affect her chances of successful GAS. Id. 12:2-20. She thought about hurting herself a lot and "prayed every day of [her] life for God to let [her] wake up and be a girl." Id. 12:23-13:2. She has experienced "constant[]" depression throughout her entire life except for a "brief respite in 2015 when [she] actually thought that things were going to go right." Id. 13:3-5, 13:25-14:11. Until the age of 29, she "drank a lot" to try and alleviate the depression. Id. 14:13-22.

After Petitioner's initial consultation with the Eskenazi Health Center, she began treatment to start her gender transition, and she has presented and identified as a woman since July 27, 2015. Id. 60:17-23; ECF No. 2 (Pet.) at 9. Petitioner saw members of her medical team on a near weekly basis for mental health counseling, speech pathology, endocrinology, and other matters relevant to treating her gender dysphoria. June 29, 2022 Tr. 61:3-20. In August of 2015, she started hormone therapy to increase her estrogen and lower her testosterone. Id. 61:23-63:18. Petitioner's goal was GAS: she consulted with a surgeon and decided that she wanted to proceed when her course of treatment would permit. Id. 64:3-17; Declaration of Dr. Janine Fogel (Fogel Decl.) (submitted by Petitioner in advance of evidentiary hearing) ¶ 3 (explaining that Petitioner's treatment plan to transition from her assigned gender at birth (male) to match her gender identity (female) included the administration of gender affirming hormone therapy and contemplated GAS, including an orchiectomy).[10]

Before Petitioner's federal conviction, she was treated at Eskenazi Health for about 18 months. June 29, 2022 Tr. 65:9-14. During that time, she expressed herself outwardly as a

---

[10] An orchiectomy is a surgery to remove one or both testicles. Mayo Clinic, Feminizing Surgery, https://www.mayoclinic.org/tests-procedures/feminizing-surgery/about/pac-20385102 (last visited July 13, 2022). Transgender people typically seek orchiectomies to stop the production of testosterone and/or sperm, or to affirm their gender. Id. Having an orchiectomy also removes the need to take an anti-androgen medication (i.e., a testosterone suppressant or blocker). Id.

woman by buying herself new clothes, getting hair extensions, wearing jewelry and makeup, and having her nails done. Id. 65:17-66:6. Petitioner also requested that people refer to her using "she" and "her" pronouns. Id. 71:14-25. In April 2016, Petitioner appeared before a court in Indiana and presented documents indicating that she had undergone "appropriate clinical treatment to [permanently] change her gender." Pet. at 9; Pet. Ex. A (letter from Dr. Janine Fogel, Petitioner's treating physician for gender dysphoria before she entered federal custody, stating that Petitioner "has had appropriate clinical treatment for gender transition"; Dr. Fogel's statement of gender change addressed to the Indiana Bureau of Motor Vehicles).[11] The court ordered that Petitioner's name be legally changed and her birth certificate corrected to reflect her gender as a female. Pet. at 9; Pet. Ex. B (May 15, 2017 birth certificate identifying Petitioner by her current name and listing her sex as "F"). Petitioner also presented Dr. Fogel's statement to the United States Social Security Administration, which subsequently confirmed that Petitioner's gender is female. Pet. at 9; Pet. Ex. C (May 5, 2018 Social Security Administration letter).

Petitioner's treatment at Eskenazi Health and gender expression alleviated her gender dysphoria: "It's like the bathroom door got unlocked and I could actually come out and be who I want to be, you know, I was happy, the depression wasn't so bad, the anxiety was not here, I was finally about to be a girl . . . . Your prayers, you know, your prayers have been heard, you've been a girl all along." June 29, 2022 Tr. 71:5-12.

## VI.   BOP Custody and TEC Determinations

### A.   Federal Crime and Sentencing Recommendation

On September 13, 2017, Petitioner pleaded guilty in the United States District Court for the Southern District of Indiana to distribution of visual depictions of minors engaging in

---

[11] All citations to "Pet. Ex." or "Resp't Ex." refer to the parties' exhibits submitted in advance of the June 28 and June 29, 2022 evidentiary hearing.

sexually explicit conduct, in violation of 18 U.S.C. § 2252(a)(2). See United States v. Shelby, No. 17-cr-00067 (JMS)(MJD) (S.D. Ind. 2017); see also ECF No. 13 (Johnson Decl.), ECF Nos. 13-1 (Plea Agreement), 13-2 (Criminal Judgment). She was sentenced to a mandatory minimum term of incarceration of 180 months, followed by a ten-year term of supervised release (to include participation in sex offender treatment). See Criminal Judgment at 2-3. Petitioner is expected to complete her term of imprisonment on December 3, 2029. Johnson Decl. ¶ 11.

The sentencing judge was aware of Petitioner's ongoing treatment for gender dysphoria and recommended that Petitioner be placed in a "medical facility with females at either FMC Lexington in Kentucky, or FMC Carswell in Fort Worth, Texas, and continue treatment for gender dysphoria." Criminal Judgment at 2; June 28, 2022 Tr. 75:11-76:5. She has never been housed in a women's facility.

### B.    Initial Designation and Processing

Petitioner was first transported to the Federal Transfer Center in Oklahoma City (FTC Oklahoma City). There, she notified BOP that she was a woman and requested to be treated accordingly. Pet. at 10. She was initially placed in a single occupancy holding cell and later moved to a unit with men, where she was dressed in men's undergarments. Id. Petitioner repeatedly contacted staff and psychologists requesting to be moved out of the men's unit and facility. Id.

Petitioner was then sent to the Federal Correctional Institution in Marianna, Florida (FCI Marianna), a men's facility. Id. She immediately declared her gender status to staff and reports that she was subject to their harassment and ridicule. Id. A staff psychologist reportedly told her: "This is all new here to us, you'll have to be patient with us. This is the 'Old South.' This is the Bible Belt and we do things differently down this way." Id. at 11. The psychologist allegedly

told Petitioner that if she did not have any disciplinary issues, the psychology department would request her redesignation to a women's facility after one year. Id. The psychologist also asked Petitioner if she wanted to participate in SOMP at FCI Marianna. June 29, 2022 Tr. 91:24-92:10. After learning how the program worked, Petitioner explained that she had recently completed similar sex offender treatment while in state custody. Id. The psychologist told Petitioner that treatment was not mandatory, so Petitioner decided not to participate in SOMP at that time. Id. 92:11-16. During the evidentiary hearing, Dr. Bowe (Petitioner's mental healthcare provider at FCI Otisville) also explained that Petitioner was reluctant to participate in SOMP in a men's prison specifically because of her experience living in a sex offenders' unit at FCI Marianna, where she heard a lot of male sex offenders talking about their conduct in a way that affected her. June 28, 2022 Tr. 45:10-20. Having participated in SOMM while in state custody, Petitioner "had worked a lot on herself to . . . not think like that anymore and [had] made progress so she was always reluctant to consent to going to one of those programs because she didn't want that exposure" to people who did not take the programming seriously. Id. 45:19-24, 46:4-8.

During the eight weeks Petitioner spent at FCI Marianna, she was housed with two men, one of whom attempted to sexually assault her and threatened her with physical harm if she reported him. Pet. at 11; June 29, 2022 Tr. 88:19-89:6. Petitioner eventually notified a counselor and a psychologist about the incident and asked to be moved, then filed a PREA report and was placed in the Special Housing Unit (the "SHU"). Pet. at 11; June 29, 2022 Tr. 89:14. Petitioner claims that the PREA investigator "covere[ed] up the complaint" and issued a report indicating that Petitioner's allegations were unfounded. Pet. at 11; June 29, 2022 Tr. 89:15-90:8.

Petitioner was designated for permanent assignment at FCI Otisville. Pet. at 11. While in transit, she spent five weeks at the Metropolitan Detention Center in Brooklyn, New York

(MDC), where she was again housed with men. Id. One man assigned to Petitioner's cell pressured her for sexual favors and groped her breasts. Id.; June 29, 2022 Tr. 93:24-94:9. Petitioner reported the incident to the unit officer and requested protective custody. She completed a PREA report, was interviewed by a psychologist, and was placed in the SHU under protective custody where she remained until she was transported to FCI Otisville. Pet. at 12; June 29, 2022 Tr. 94:12-95:2. According to Petitioner, the incident at MDC was not investigated. Pet. at 12.

### C.     FCI Otisville

After arriving at FCI Otisville, Petitioner notified medical and administrative staff of her desire to be designated to a women's facility so that she could continue treatment for her gender dysphoria. Pet. at 12. Staff informed Petitioner that they could not alter her designation. Id. Petitioner filed an administrative appeal and, on August 2, 2018, the BOP Administrator for National Inmate Appeals replied that the TEC had advised that Petitioner was appropriately designated to a facility commensurate with her security, custody, and medical needs. See id. at 27 (Administrative Remedy Response). Accordingly, Petitioner's appeal of her designation was denied. Id.

#### 1.     Harassment and Assault

When she arrived at FCI Otisville in March 2018, ECF No. 35 (Pedone Decl.) ¶ 3, Petitioner was placed across the hall from the officer's station under "close observation" and remained there throughout her time at the facility. Pet. at 12. Within two days of her arrival at FCI Otisville, Petitioner was stopped by a male correction officer ("CO") while she was exiting the dining facility. Id. The CO subjected Petitioner to a pat search and squeezed her breasts during the search. Id.; June 29, 2022 Tr. 95:15-96:8. Petitioner reported the incident and was

given a card that states that she should be patted down or visually searched only by female staff.

Petitioner claims that the male CO continued to harass her until she filed a complaint with the

Department of Justice, at which point the Assistant Warden intervened and the harassment

stopped. Pet. at 12. Multiple other COs at FCI Otisville verbally harassed Petitioner about having

a penis and acting like a man, June 29, 2022 Tr. 97:5-15, and she experienced "daily" sexual

harassment by other prisoners, id. 97:19-99:5 (describing how other prisoners called her by her

deadname—the name she had used before transitioning—after an CO told them what it was,

exposed their genitals to her, and groped her). Then, in April of 2021, Petitioner was raped by

another prisoner. Id. 99:6-20. She did not report the assault at the time because she was afraid of

him and concerned about repercussions but reported it in early 2022 because a housing

assignment would have put her in the same unit as her assailant. Id. 99:21-101:24. Her report

was unsubstantiated.[12] Resp't Ex. F (PREA Records) at 8.

### 2.    Medical Care for Gender Dysphoria

Throughout her time in BOP custody and, more specifically, while at FCI Otisville,

Petitioner advocated for and received certain medical care for her gender dysphoria. BOP

medical records reflect that she has received hormone therapy to reduce balding, lower her

testosterone levels, and increase her estrogen levels; as a result, Petitioner's hormone levels have

largely remained consistently within the guidelines for a transgender woman. See, e.g., ECF No.

37-1 (2018 Medical Records Part 1) at 3, 4, 8, 21, 36, 152-53, 158-59; ECF No. 37-3 (2019

Medical Records) at 40, 120, 128; ECF No. 37-4 (2020 Medical Records Part 1) at 301; June 28,

2022 Tr. 135:13-15.

---

[12] Dr. Bowe, Petitioner's counselor while she was at FCI Otisville, confirmed that Petitioner had reported
sexual assault and harassment while in BOP custody, including sexual assault and harassment by other
prisoners and inappropriate contact and harassment by BOP staff. June 28, 2022 Tr. 35:24-37:19.

Petitioner also regularly sees a BOP therapist for her gender dysphoria and post-traumatic stress disorder and takes medication for her anxiety disorder. See, e.g., 2018 Medical Records Part 1 at 13, 93, 113-14. While at FCI Otisville, she regularly met with Dr. Jennifer Bowe, who has worked at FCI Otisville since 2005 and for the BOP since at least 2002. June 28, 2022 Tr. 10:8-14, 12:10-17, 16:12-22. As part of a full diagnostic examination to determine the level of mental healthcare that Petitioner required, in June 2018, Dr. Bowe diagnosed Petitioner with gender dysphoria, post-traumatic stress disorder, and pedophilic disorder (which Dr. Bowe marked as in remission in 2019). Id. 16:4-11, 16:24-17:9, 18:23-19:9, 25:17-22; 2019 Medical Records at 5-6. Petitioner met with Dr. Bowe one to two times a month over the course of four years. Id. 21:22-25. Petitioner was never denied mental health counseling while at FCI Otisville, and the counseling assisted in managing her depression. June 29, 2022 Tr. 110:10-15.

For seven years, Petitioner has wanted to live as a woman and receive GAS. She told this to her doctors before she was incarcerated, see, e.g., 2018 Medical Records Part 1 at 267, 272; ECF No. 37-2 (2018 Medical Records Part 2) at 21, and she has repeatedly raised the issue with her physical and mental healthcare providers while in BOP custody, see, e.g., 2018 Medical Records Part 1 at 181-82 (September 2018 message from Petitioner to Health Services asking to "move the process along with [her] transition" because the "prolonged waiting is causing [her] unnecessary anxiety and increased depression with [her] dysphoria"); id. at 7 (November 2018 chronic care clinic note that Petitioner "is anxious about a decision on whether she will be able to be transferred to a female facility and ultimately to expedite her gender affirming surgery" and that she is "obsessed with her hair and nails and is asking again about [medication] for her developing male pattern baldness"); id. at 166 (December 2018 message from Petitioner to Health Services asking "to be seen soonest about surgery options" because she is "unwilling to

continue to wait patiently for [her] vagina to miraculously appear"); 2019 Medical Records at 65-66 (January 2019 chronic care clinic note stating that Petitioner wants breast augmentation and an orchiectomy "so that [she does] not have to continue these dangerous medications," describing her disappointment at being denied transfer to a women's facility to start the process toward GAS, and noting that Petitioner said she "is trying to do things the right way"); id. at 40 (May 2019 chronic care clinic note that Petitioner is "not going to stop asking about [her] breast augmentation and vaginaplasty [sic], that's [her] goal"); id. at 11 (November 2019 chronic care clinic note that Petitioner is "still feeling too 'manly'"); 2020 Medical Records Part 1 at 25 (November 2020 chronic care clinic note that Petitioner "is now expressing a desire again to address her orchiectomy").

### 3.      Effects of Gender Dysphoria and BOP Refusals to Transfer

Petitioner's gender dysphoria and the BOP's refusal to transfer her to a women's facility (and associated delay in her ability to pursue GAS) have caused her mental distress throughout her incarceration. See Resp't Ex. C (BOP Psychology Services Records) at 190-225 (records of Petitioner's psychological treatment while at FTC Oklahoma, FCI Marianna, and MDC). In 2018, a month after arriving at FCI Otisville, Petitioner expressed frustration with being "biologically male" and explained that before her incarceration, she had been preparing to undergo GAS, and that she "[couldn't] wait" to have her penis removed. Id. at 180. That June, Petitioner told her psychologist that she "is not happy having a male anatomy," that other prisoners were reminding her that she had a penis, and that she was sad and frustrated because the transition process was taking so long. Id. at 162. In October, while awaiting a decision on her request to transfer to a women's facility, Petitioner felt she was "ready to go" so that she could "reach the final stages of her transitioning." Id. at 298. Then, in December, after Petitioner's

transfer request was denied, she expressed that she "hated" her body and "was disgusted" having to look at it and threatened to perform an orchiectomy on herself. Id. at 295.

  In 2019, Petitioner reported during a February psychological visit that she was "devastated" by a recent denial of her request for an orchiectomy, that she was "tired" of feeling trapped in a man's body, and that she was considering doing the procedure herself. Id. at 291-92. In April, Petitioner described wanting to cut off her testicles "many times throughout her life as she always wanted to be female." Id. at 284. In May, Petitioner expressed "disgust for her male anatomy, and frustration over feeling like her requests are being ignored." Id. at 157. An August suicide watch contact note and risk assessment stated that Petitioner was "tired of being told she has male genitalia and that she is in a male prison and will be treated as a male," that she stated "I'll cut it off and hand it to them," that she thought about suicide "all the time" and was "tired of living in this body," that she did not feel "safe from herself," and that she was angry and upset about the pace of her gender transition. Id. at 136-37. Also in August, Petitioner reported that she is "told every day by someone that she is a man by either inmates or staff and it is hard for her." Id. at 150. In September, Petitioner was reported as having "been very vocal with staff members regarding her desire to change and has expressed frustration and depression related to the BOP's refusal to move her to a female facility and to grant the surgery she believes would be helpful to her" and that she "sometimes experiences feelings of depression related to having to live in a male prison due to her physique." Id. at 121. In October, Petitioner told her case manager that "if she did not receive her surgery in sixty days, she was going to cut off her testicles herself" (though she ultimately denied plans to do so), and that she was frustrated about her hormone levels. Id. at 119.

Then, in 2020, Petitioner, said during a March therapy session, "I'm not hurting anyone, I used to be bad but I don't hurt people anymore, I just want to be a girl." Id. at 98. In April, Petitioner was "happy that she was permitted a razor to shave with so she did not have to look at her facial hair." Id. at 95. That June, Petitioner expressed that she "wishes her desire for surgery was taken more seriously as she believes taking hormones to suppress her testosterone [is] negatively affecting her" and that "she would not have to take them if her testicles were removed." Id. at 91.

In 2021, Petitioner told her psychologist in January that she "feels uncomfortable in a male prison, and she does not want anyone else to feel that way." Id. at 72. In May, she was tearful when explaining that "the consistent questioning of her bra and prosthetic [breasts] only reminds her of how inadequate her body is," and that she felt that "since no one is going to help her get transition surgeries that they should not remind her that she does not have the 'right parts.'" Id. at 65. Also in May, she told her psychologist that she "wants to feel like a woman and not be reminded of every missing body part." Id. at 64. In August, Petitioner said that she "believes that she would be safer in a female institution." Id. at 54.

In 2022, Petitioner reported in January that she was "having periods of depression and feeling despondent over her perception of her treatment as a transgender" woman. Id. at 34. In March, after the TEC rejected her transfer request, she said that the rejection was "hard for her, as she claimed, 'I just want to be a girl! I can't be a girl here,'" and that she felt "as though she is being denied the right to be herself." Id. at 27. Also in March, a post-suicide watch report stated that Petitioner was frustrated "over not being able to further in her gender transitioning at this time and not feeling as if she can be a girl while in a male facility." Id. at 16. In May, a mental health transfer summary explained that Petitioner "presents as transgender with dysphoria related

to her having male anatomy and being limited in her ability to express her femininity," that she has "experienced suicidal ideation in relation to her gender dysphoria and feeling stuck in one stage of the process of her transition," that she "has been very vocal with staff members regarding her desire to change and has expressed frustration and depression related to the BOP's refusal to move her to a female facility and grant the surgery," that "[m]any sessions have focused on her learning to cope with this frustration," and that she "sometimes experiences feelings of depression related to having to live in a male prison due to her physique." Id. at 7-8.

Dr. Bowe confirms this: over the four years that she met with Petitioner, Dr. Bowe determined that she suffered from depression "largely related to her gender dysphoria, her transgender status, and just being, having to live in the male prison and just not be able to express herself the way she wanted to." June 28, 2022 Tr. 22:13-22. Petitioner expressed a desire to be transferred to a women's prison "many times," id. 29:14-20, and it was Dr. Bowe's opinion that living in a men's prison "inhibited her ability to express herself the way she felt comfortable and the way she felt about herself," id. 29:21-30:4. According to Dr. Bowe, living in an all-men's environment was a "contributing factor" to Petitioner's depression, and continuing to live in a men's prison would contribute to her gender dysphoria. Id. 30:5-31:2. Dr. Bowe believed that Petitioner's mental health could improve if she was transferred to a women's prison and that her depression could be alleviated (though Dr. Bowe acknowledged that the antidepressants prescribed to Petitioner were helpful in treating her symptoms of depression). Id. 31:3-7, 31:15-17, 52:8-12. In Dr. Bowe's words, Petitioner had "been living as a woman for many years now consistently," was "taking hormone treatments," and was "consistent in wanting [her gender transition] process to go forward." Id. 39:18-40:3. Petitioner felt "stagnant and stuck in a . . . male prison where she didn't want to be" and "not as able to express herself as a woman while

living" there; she wanted "to be in a female prison" "to move forward with the gender affirming surgeries." Id. 42:23-43:2, 44:16-17.

Dr. Fogel, the founder and medical director of the Gender Health Program at Eskenazi Health, treated Petitioner at Eskenazi Health for gender dysphoria before she entered federal custody. Dr. Fogel expressed "concern" at Petitioner's placement in a men's prison for several reasons. Fogel Decl. ¶ 6. First, transgender people are at increased risk of violence compared to cisgender people and putting a transgender woman like Petitioner in a men's prison places her at a "greater risk of attack" than if she were in a women's prison. Id. Second, "forcing her to reside amongst a population of persons whose gender identity is male, while her gender identity is female," could be "detrimental" to Petitioner's mental health because "she will likely constantly feel as though she is always out of place and not accepted for who[] she is" and "living in an all male environment will likely inhibit her from fully presenting herself as the [woman] she sees herself to be." Id. Living in a men's prison could cause Petitioner "to be in a state of constant and severe depression," and if the circumstances do not change over time, the depression could cause Petitioner to experience "despair and hopelessness," potentially leading to her contemplating "self mutilation or suicide." Id.

In Dr. Fogel's opinion, transferring Petitioner to a women's prison would help alleviate depression that Petitioner may suffer because she would live among other people who share her gender identity and would not feel like an outcast. Id. ¶ 7. Additionally, in a women's prison, Petitioner would have access to a wider variety of women's apparel, cosmetics, and accessories that would be beneficial to her mental health and gender expression. Id. "From a mental health perspective, unless it was [Petitioner's] choice, [Dr. Fogel] [did] not foresee there being any

reason why it would be more beneficial for [Petitioner] to be confined to a men's prison instead of a women's prison." Id. ¶ 8.

### 4.   Other Accommodations

In addition to mental healthcare and hormone therapy, the BOP claims that Petitioner has been granted other accommodations to assist her gender expression. For instance, Petitioner dyed her hair pink and painted her nails. ECF No. 34 (Opp.) at 9; 2019 Medical Records at 8. Petitioner explains that FCI Otisville policy did not permit her to dye her hair but that she did so anyway using acrylic paint mixed with conditioner; some staff members looked the other way, while others would tell her to wash the dye out. June 29, 2022 Tr. 81:16-82:15. She painted her nails using acrylic paint and floor wax, not using nail polish. Id. 82:25-83:9. Additionally, the BOP notes that Petitioner is "permitted to wear" hair scrunchies and stockings, but Petitioner says that she made the scrunchies herself, and that the stockings were compression stockings intended for medical use. Id. 80:22-81:3, 111:16-19; 2018 Medical Records Part 1 at 177. Petitioner was also approved for prosthetic breasts, and before the COVID-19 pandemic, transgender prisoners at FCI Otisville had peer group meetings, though Petitioner testified that only three meetings took place. Pet. Ex. H at 2; Resp't Ex. G (Petrucci Decl.) ¶ 5; Pedone Decl. ¶ 11; June 29, 2022 Tr. 111:23-25.

### D.   Pre-2022 TEC Meetings About JJS

Petitioner has asked to be transferred to a women's facility multiple times throughout her incarceration at FCI Otisville, June 29, 2022 Tr. 85:7-9, and the TEC has met and discussed Petitioner's case six times since October 2017.[13]

---

[13] The first time the TEC discussed Petitioner was on October 12, 2017, when the TEC confirmed that she would be designated to a men's facility "commensurate with security and care level." Resp't Ex. D at 22.

First, on November 5, 2018, then-Warden Petrucci submitted a memorandum on Petitioner's behalf to the TEC, asking that the TEC "consider [Petitioner's] request for a transfer to a female institution where she can move on to the next phases of her transitioning." Pet. Ex. G at 1. Warden Petrucci explained that she had already been in the process of transitioning before she entered BOP custody, and that Petitioner's doctors had been considering her for GAS before her arrest. Id. at 1. Petitioner was compliant with her medication regimen, attended individual mental health therapy sessions, and "appear[ed] to have developed good insight and self-awareness." Id.  In his written testimony, Warden Petrucci recalled transmitting "at least one petition" from Petitioner to receive GAS to the BOP's central office but did not recall taking any action in his official capacity regarding Petitioner's request to be transferred to a women's facility, "except insofar as it might have come up as a necessary pre-condition for GAS." Petrucci Decl. ¶¶ 3-4. He also testified that he did not transmit any memoranda relating to Petitioner's transfer request. Id. ¶ 4; but see Pet. Ex. G at 1 (November 2018 memorandum to TEC signed by Warden Petrucci beginning with the sentence, "This memo is to bring [Petitioner's] request for a transfer to a female facility to the attention of the [TEC].").

On November 19, 2018, the TEC discussed Petitioner but concluded that based on her "offense and conduct, transfer to a female facility [was] not considered at this time." Resp't Ex. D at 33. The TEC noted: "Continue to monitor and maximize hormones. Psychology will consult with institution." As of October 1, 2018, Petitioner's testosterone and estradiol levels were 1.3 ng/dL and 114.6 pg/mL respectively, both within the target range for transgender women identified by international endocrinology experts.[14] Resp't Ex. B (Medical Records) at 250.

---

[14] See Wylie C. Hembree et al., Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline, 102 J. Clinical Endocrinology & Metabolism 3869, 3890 tbl. 15 (2017) (for transgender women, testosterone levels not to exceed 50 ng/dL and estradiol levels not to exceed 100-200 pg/mL).

The TEC did not discuss Petitioner again until over two years later. On December 21, 2020, the new Warden of FCI Otisville, Warden Elmore, wrote a memorandum to the TEC about Petitioner's suitability for transfer to a women's facility. Pet. Ex. H. Warden Elmore compiled evidence from Health Services, Psychology Services, and Unit Management, noting that Petitioner's "presentation as a transgender female and desire to manage her Gender Dysphoria is pervasive and consistent," that "she has always 'felt different' and did not want her penis since she was a young person," that she "make[s] attempts to use any substance at her disposal to continue feminization, often to comments or correction by staff," and that "[h]er outward appearance presents as an individual who has stereotypical female characteristics." Warden Elmore wrote: "The greatest stressor for her is her inability to present more feminine which decreases her chance of 'passing' as a female. She often states her distress lies in being 'treated like a boy. If I wanted to be a boy I would be. I am a girl, and I want to be able to act like such.'" Id. at 1-3.

Additionally, Warden Elmore confirmed that Petitioner's testosterone and estrogen levels were "both within or clinically similar to target ranges associated with transition from male to female" as reported in the BOP's clinical guidance for transgender prisoners. Id. at 3. Finally, the memorandum noted that Petitioner had asked to be placed in a women's facility "for many years," and that she had incurred only three incident reports since entering BOP custody. She always sought help when feeling suicidal or self-injurious, and the "core" of those thoughts was her gender dysphoria; "[t]hese feelings of isolation and loneliness are supportive of her desire to transition to a female institution and engage with individuals who match her identified gender." The memorandum did not mention any issues with sexual conduct or behavior. Id.

On January 4, 2021, the TEC discussed Petitioner's designation. The TEC's minutes as to Petitioner read, in their entirety: "Continue at a male facility, recommend mental health programming, compliance with all recommended programming and treatment, maintain clear conduct, continue to monitor and maximize hormone levels. Once these goals have been reached, have institution contact TEC for reevaluation." Resp't Ex. D at 44. The TEC's inmate summary for Petitioner noted that, as of October 2020, her testosterone and estradiol levels were 11 ng/dL and 209.0 pg/mL respectively, again, "both within or clinically similar to target ranges associated with transition from male to female." Id. at 10.

Jenna Epplin, who has served as the National Policy and Program Coordinator for Transgender Inmates in the BOP's Women and Special Populations Branch, Reentry Services Division, since 2020, was present at the January 2021 meeting (and has been present at every meeting since). June 28, 2022 Tr. 114:5-16; see Resp't Ex. D. According to Epplin, when deciding a prisoner's transfer request, the TEC reviews any information sent by the executive staff at the prisoner's institution, the prisoner's judgment and commitment documents, medical and mental healthcare records, and other "pertinent" documentation. June 28, 2022 Tr. 130:4-10. The TEC generally does not interview the prisoner when making its determination. Id. 147:18-21, 148:18-20, 150:21-25, 155:19-22. Dr. Bowe testified that, even though she met with Petitioner on a monthly basis, no one from the TEC ever contacted Dr. Bowe to discuss Petitioner's case before making a decision as to her requests, and the TEC reported its decisions to FCI Otisville verbally. Id. 33:3-10, 34:9-15.

### E.     2022 TEC Meetings

#### 1.     The February 2022 Meeting and Recommendation that Petitioner Participate in Residential SOMP

FCI Otisville Warden Pliler submitted another memorandum to the TEC on February 9, 2022. See Resp't Ex. D at 23-26. Like his predecessor, Warden Pliler reported on Petitioner's hormone levels, confirming that they are "within or clinically similar to target ranges associated with transition from male to female," and she has demonstrated "relative stability in her levels for more than a year." Id. at 25. Notwithstanding her hormonal stability, and despite Petitioner's "pervasive and consistent" desire to manage her gender dysphoria, Warden Pliler reported that Petitioner "has made no notable changes in this domain and has only increased her comments regarding her unhappiness and concerns being around cisgender men." The Warden continued to note that the "greatest stressor for her is her inability to present more feminine which decreases her chance of 'passing' as a female." Id. at 23-24. Warden Pliler noted minor disciplinary infractions but described them as "more stereotypical of a female facility and less stereotypical of a male medium facility." Id. at 25. Otherwise, she "has had good adjustment upon arrival at FCI Otisville considering all circumstances." Warden Pliler reiterated the conclusion of Warden Elmore that Petitioner's "feelings of isolation and loneliness are supportive of her desire to transition to a female institution and engage with individuals who match her identified gender." Id.

On February 28, 2022 (just after briefing in this case was completed), the TEC met to discuss Petitioner. The TEC denied the transfer request as follows: "Continue at a male facility, recommend mental health programming to include Sex Offender Management Program, compliance with all recommended programming and treatment, maintain clear conduct, and continue to monitor and maximize hormone levels." Id. at 29. The February 2022 meeting was

the first time the TEC mentioned that SOMP participation was recommended for Petitioner. FCI Otisville does not offer SOMP.

Dr. Kristin Willert, who has worked as the Sex Offender Programs Coordinator for the BOP's Reentry Services Division since February 2017, was contacted by the TEC in February of 2022 to review Petitioner's case in connection with SOMP participation. June 28, 2022 Tr. 58:15-59:15. When the TEC contacts Dr. Willert and asks her to review a specific prisoner who has a history of sexual offenses, she conducts a risk assessment, scores the prisoner on a Static-99R (if possible) and determines whether residential or non-residential SOMP would be most appropriate. Id. 67:23-68:10. Then, Dr. Willert informs the TEC which type of SOMP the prisoner is best suited for, but she does not make a final recommendation as to whether that person requires treatment. Id. 68:10-13. The TEC makes a final decision as to whether the prisoner in question is required to undergo SOMP treatment or whether treatment is voluntary. Id. 68:17-23.

In reviewing Petitioner's case, Dr. Willert looked at her SOMP-related records and her 2017 pre-sentence investigation report to score Petitioner on a Static-99R. Id. 69:21-70:6, 108:2-9. Dr. Willert concluded that, because Petitioner's Static-99R score placed her in the "above average" risk category, she would be most appropriate for residential SOMP. Id. 70:8-13. With respect to Petitioner's concern that a residential treatment program (and living with other male offenders) might be triggering, Dr. Willert acknowledged that it was an "unfortunate" aspect of treatment programs because the BOP could not control what participants might say or how they might act. Id. 72:8-10. Dr. Willert also testified that people who have successfully completed sex offender treatment programs should "choose to be around" people who have not completed such a program "the least amount as possible," and that she would "discourage" people who have

completed sex offender treatment from being in the presence of people talking about their sexual offenses. Id. 88:23-24, 89:20. Dr. Willert nevertheless believed that Petitioner would benefit from participating in residential SOMP treatment, even though she was aware that Petitioner had undergone voluntary sex offender treatment while in state custody. Id. 73:4-6, 76:17-19.

When asked if Petitioner's risk assessment would change if she had a surgical procedure to remove her penis, and whether it would change Dr. Willert's recommendation from residential to non-residential SOMP for Petitioner, Dr. Willert said, "We've never been in this situation before and I . . . just don't know what we would do." Id. 83:22-23.

Epplin, who participated in the January 2021 and February 2022 TEC meetings, added that, for someone convicted of a sex offense, the TEC generally recommends that SOMP be completed before that person is transferred to a gender affirming facility because people at the gender affirming facility "would not always feel as comfortable with a sex assigned at birth male participating in [SOMP with them] when we have so many inmates there, especially in female institutions, that are the victims of sex abuse and trauma." Id. 128:12-16. In Petitioner's case, the TEC believed it was best for her to participate in SOMP in a men's facility given her previous "heinous" state crimes and for the safety of other prisoners in the women's facility. Id. 137:3-6. See also id. 203:7-204:11 (Epplin: "[T]he rape is what has given us the cause for concern." Petitioner's Attorney: "The rape which occurred 30 years ago?" Epplin: "Yes.").

In its February 2022 discussion, the TEC recommended that Petitioner participate in SOMP due to her history of sex offenses. Id. 133:8-9, 14-16. The TEC did not appear to have considered her previous completion of sex offender treatment. Epplin testified, however, that even if a prisoner has participated in another agency's SOMP, the TEC still recommends

participation in a BOP program so it can monitor and evaluate the person's participation and level of completion. Id. 133:23-134:8.

Epplin acknowledged that the TEC had not recommended participation in SOMP before February 2022 but did not explain why the TEC suddenly did so now. Id. 171:20-172:2, 183:12-17, 189:4-7. Petitioner confirmed that she was not told until 2022 that the TEC wanted her to enroll in SOMP before being considered for transfer to a women's facility. June 29, 2022 Tr. 92:11-93:8.

### 2. Subsequent Meetings

On March 14, 2022, the TEC discussed Petitioner again, finding that it "[p]reviously recommended mental health programming to include SOMP, inmate is currently declining and will remain at her current institution." Resp't Ex. D at 28.

On April 7, 2022, the TEC conducted an "informal review" of Petitioner because of a transfer referral. Id. at 39. Petitioner had reported to FCI Otisville that she had been sexually abused by another prisoner and contracted a sexually transmitted disease as a result. Id. The institution ultimately found that her claim was not substantiated but recommended Petitioner's transfer. Id. The TEC recommended that Petitioner be transferred to "a facility with the SOMP as the TEC has previously recommended this program and then inmate has declined but has stated some interest." Id. Notes from a subsequent TEC case summary for Petitioner reflect that "there are numerous PREA-related contacts for her in the [past] two years." Id. at 40.

**DISCUSSION**

I.    **Petitioner's Eighth Amendment Claims**

A.    **Legal Standard**

Section 2241(c)(3) "authorizes a district court to grant a writ of habeas corpus whenever a petitioner is 'in custody in violation of the Constitution or laws of the United States.'" Wang v. Ashcroft, 320 F.3d 130, 140 (2d Cir. 2003) (quoting 28 U.S.C § 2241(c)(3)). Unlike a petition challenging the legality of a federal prisoner's sentence, a petition challenging the *execution* of a federal prisoner's sentence, "including such matters as the administration of parole, computation of a prisoner's sentence by prison officials, prison disciplinary actions, prison transfers, type of detention and prison conditions," is properly brought under § 2241. Jiminian v. Nash, 245 F.3d 144, 146 (2d Cir. 2001); Carmona v. U.S. Bureau of Prisons, 243 F.3d 629, 632 (2d Cir. 2001). See also Thompson v. Choinski, 525 F.3d 205, 209 (2d Cir. 2008) (challenge to conditions of confinement including denial of access to law library and denial of kosher food properly asserted as § 2241 petition); Berkun v. Terrell, No. 12-cv-706 (JG), 2012 WL 3233897, at *2 (E.D.N.Y. Aug. 6, 2012) (challenges to general conditions affecting a prisoner's quality of life are properly brought pursuant to § 2241) (citing Jenkins v. Haubert, 179 F.3d 19, 28 (2d Cir. 1999)); Ilina v. Zickefoose, 591 F. Supp. 2d 145, 150 (D. Conn. 2008) (§ 2241 claim that federal prisoner received constitutionally inadequate medical care was cognizable regardless of whether she has an additional civil rights claim). The parties do not dispute that Petitioner has exhausted her administrative remedies before bringing this lawsuit. See Reynolds v. Petrucci, No. 20-cv-3523 (LLS), 2020 WL 4431997, at *2 (S.D.N.Y. July 29, 2020) ("While there is no statutory exhaustion requirement for a § 2241 petition, in this Circuit, exhaustion of administrative remedies is generally a prerequisite to habeas corpus relief under § 2241.").

Petitioner's supplemental petition asserts that the BOP has violated the Eighth Amendment by refusing to transfer her to a women's facility and refusing to provide her with GAS. Because the BOP represents that it will likely not consider Petitioner's request for GAS before she spends a year at a women's facility, and because a record could more expeditiously be established on Petitioner's transfer request, I directed the parties to present evidence only as to Petitioner's transfer request.[15]

The Eighth Amendment to the Constitution protects prisoners from cruel and unusual punishment. U.S. Const. amend. VIII. It is violated by the unnecessary and wanton infliction of pain and suffering. The "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." Estelle v. Gamble, 429 U.S. 97, 104 (1976) (cleaned up). "This is the case 'whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.'" Randle v. Alexander, 960 F. Supp. 2d 457, 471 (S.D.N.Y. 2013) (quoting Estelle, 429 U.S. at 104-05).

A deliberate indifference to medical need claim has two elements. The first requirement is objective: the alleged deprivation of adequate medical care must be "sufficiently serious." Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006) (cleaned up). The second requirement is subjective: "the charged officials must be subjectively reckless in their denial of medical care." Spavone v. N.Y. State Dep't of Corr. Servs., 719 F.3d 127, 138 (2d Cir. 2013) (citing Salahuddin, 467 F.3d at 280).

---

[15] If the Court adopts my recommendation that Petitioner be transferred to a women's facility, the Court may retain jurisdiction with regards to Petitioner's GAS claim.

With respect to the objective prong, courts make two inquiries. "The first inquiry is whether the prisoner was actually deprived of adequate medical care" because prison officials are required to provide only "reasonable" care and cannot be held liable for taking reasonable action. Salahuddin, 467 F.3d at 279-80. The second inquiry is whether the "inadequacy in medical care is sufficiently serious." Id. at 280. In determining whether a medical need is sufficiently serious to be "cognizable as a basis for a constitutional claim for deprivation of medical care," courts "consider factors such as whether a reasonable doctor or patient would find the injury important and worthy of treatment, whether the medical condition significantly affects an individual's daily activities, and whether the illness or injury inflicts chronic and substantial pain." Charles v. Orange County, 925 F.3d 73, 86 (2d Cir. 2019). And "[i]n cases where the inadequacy is in the medical treatment given," such as "if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry 'focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.'" Salahuddin, 467 F.3d at 280 (alteration in original) (quoting Smith v. Carpenter, 316 F.3d 178, 185 (2d Cir. 2003)). "Thus, although we sometimes speak of a 'serious medical condition' as the basis for an Eighth Amendment claim, such a condition is only one factor in determining whether a deprivation of adequate medical care is sufficiently grave to establish constitutional liability." Id.

As for the subjective prong, the charged official must have acted "with a sufficiently culpable state of mind." Id. (citing Wilson v. Seiter, 501 U.S. 294, 300 (1991)). "In the context of a convicted prisoner asserting a violation of an Eighth Amendment right to be free from cruel and unusual punishments," deliberate indifference is defined "subjectively, meaning that a prison

official must appreciate the risk to which a prisoner was subjected." Darnell v. Pineiro, 849 F.3d 17, 35 (2d Cir. 2017).

**B.    Application**

Having considered the parties' briefs and testimony elicited at the evidentiary hearing, I find that the BOP's repeated refusals to transfer Petitioner to a women's facility to further her gender transition, despite knowing the condition of Petitioner's physical and mental health, violate Petitioner's Eighth Amendment rights.

Petitioner has carried a diagnosis of gender dysphoria since at least 2015. Her treating physicians before she was incarcerated and her BOP healthcare providers have all recognized that this diagnosis is cooccurring with depression; that is, she suffers from clinical depression because she is not able to fully express her gender as she experiences it. While it is undisputed that Petitioner has maintained her regime of hormone therapy for years, Dr. Bowe testified that this therapy is insufficient to address Petitioner's needs. See June 28, 2022 Tr. 22:19-22 (Petitioner's depression was "largely related to her gender dysphoria, her transgender status, and just having to live in the male prison and just not being able to express herself in the way she wanted to."); id. 30:5-16 (describing living in a male facility as a "contributing factor" to her depression and that it "could" exacerbate her gender dysphoria); id. 42:21-43:2 (describing petitioner as feeling "frustrated," "stagnant and stuck," and "depressed" by being in a "male prison where she didn't want to be, she wants to be in a female prison").

BOP argues that Petitioner's gender dysphoria is being adequately treated and that any difference of opinion as to the treatment is insufficient to amount to deliberate indifference. See Roice v. County of Fulton, 803 F. App'x 429, 432 (2d Cir. 2020); Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001) ("[D]isagreements over

medications, diagnostic techniques . . . , forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for [an Eighth Amendment] claim."). This argument is contrary to the evidence-based research regarding gender dysphoria and cannot be reconciled with the facts presented at the hearing.

The WPATH Standards of Care direct that therapeutic interventions for gender dysphoria should be made on a case-by-case basis. It recognizes that treatment for one patient may be inadequate as treatment for another. Thus, denying certain interventions may not be a "difference of opinion" but a denial of effective treatment. Petitioner unquestionably has not found "comfort with [her] gender identity, role, and expression" while living in a men's facility, and she has repeatedly stated that her goal is GAS. Standards of Care at 54; see, e.g., BOP Psychology Services Records at 27 ("I just want to be a girl! I can't be a girl here."). "[T]he actual medical consequences that flow from the denial of care are highly relevant in determining whether the denial of treatment subjected the detainee to a significant risk of serious harm." Charles, 925 F.3d at 86. In 2022, the Warden of FCI Otisville reported to the TEC that while Petitioner's "desire to manage her Gender Dysphoria is pervasive and consistent," she has "made no notable changes in this domain and has only increased her comments regarding her unhappiness and concerns being around cisgender men." Resp't Ex. D at 23.

Petitioner's condition will not improve until she is permitted to progress in her transition, which she cannot do in a men's facility. Thus, the accommodations and treatment that the BOP has provided for Petitioner are insufficient in treating her serious medical needs.

Testimony from Petitioner and Dr. Bowe confirmed that remaining in a men's facility has serious detrimental effects on Petitioner's mental and physical health. Dr. Bowe testified that Petitioner experienced suicidal ideation, and Petitioner testified that she has considered self-

castration. Cf. Edmo v. Corizon, Inc., 935 F.3d 757, 785 (9th Cir. 2019) (finding gender

dysphoria to be a serious medical need where it caused the plaintiff to "feel 'depressed,'

'disgusting,' 'tormented,' and 'hopeless,' and . . . past efforts and active thoughts of self-

castration); De'Lonta v. Johnson, 708 F.3d 520, 522, 525 (4th Cir. 2013) (finding same where

gender dysphoria caused the plaintiff "to suffer 'constant mental anguish' and, on several

occasions, . . . to attempt to castrate herself "). The Court strongly rejects BOP's suggestion that

Petitioner's failure to attempt these acts is evidence of a condition under control.

       In addition to hormone treatment and mental health counseling, the evidence raises doubt

as to what accommodations are made available to Petitioner. "Stockings" turned out to be

compression socks; Petitioner stitched her own hair "scrunchies," and testimony confirmed that

Petitioner often was reprimanded for her makeshift attempts at hair dye and nail paint. See also

Resp't Ex. D at 24 (memo from Warden Pliler noting that eye shadow and hair dye "is not

currently authorized in a male facility"). Although Petitioner was provided prosthetic breasts,

there was also testimony that she was groped by correction officers because of them. See June

29, 202 Tr. 95:23-96:8.

       Additionally, none of this treatment addresses the sexual violence and harassment that

Petitioner has experienced living in a men's facility. These acts exacerbate her gender dysphoria

and depression.

       Thus, BOP's refusal to transfer Petitioner to a women's facility for the last five years—

which, in turn, has delayed her ability even to seek GAS—rises above a mere "disagreement" or

"difference of opinion" over the course of Petitioner's treatment for gender dysphoria. See

Alston v. Bendheim, 672 F. Supp. 2d 378, 385 (S.D.N.Y. 2009). Accordingly, I find that

Petitioner has been denied adequate medical care for her gender dysphoria and related depression and that this inadequacy in medical care is sufficiently serious.

Turning to the subjective prong, at least three facts support the Court's finding that BOP has acted with a sufficiently culpable state of mind in denying Petitioner's transfer requests. First, the evidence demonstrates that the staff at FCI Otisville, including the Wardens, do not oppose transfer and may support it. The Warden memos to the TEC favorably describe Petitioner's conduct at the facility and her compliance with treatment. See 2022 TEC Manual at 7 ("Prior to considering the case, the Warden will submit documentation to the TEC showing the inmate has met the minimum standards of compliance with programs, medications and mental health treatment, and meeting hormone goal levels."). Multiple Wardens reported on Petitioner's hormone levels and confirmed that there are no issues with medication compliance (2018, 2020, and 2022), and that her levels "are both within or clinically similar to target ranges associated with transition from male to female" (2020 and 2022). See Pet. Exs. G, H; Resp't Ex. D at 23-26. Psychology staff assess her to be "stable." Pet. Ex. G at 2. The Wardens describe Petitioner's efforts to present as female in a men's facility and report that Petitioner requests transfer "where she can move on to the next phases of her transition[]" (2018 and 2020). Id.; Pet. Ex. H at 3. The 2020 and 2022 Warden memos note that Petitioner's gender dysphoria causes her to feel "suicidal or self-injurious," and that these "feelings of isolation and loneliness are supportive or her desire to transition to a female institution and engage with individuals who match her identified gender." Pet. Ex. H at 3; Resp't Ex. D at 25. The 2022 Warden memo reports that, despite Petitioner's "pervasive and consistent" desire to manage her gender dysphoria, her condition has not improved and in certain respects has worsened. Resp't Ex. D at 23. None of the Warden memos to the TEC raises any concerns about Petitioner's transfer to a women's facility.

Dr. Bowe was more direct, concluding that the transfer denials have caused a seriously deleterious effect on Petitioner's medical conditions. Despite being Petitioner's long-term counselor, Dr. Bowe testified that the TEC never contacted her regarding Petitioner's transfer requests. June 28, 2022 Tr. 33:3-5.

Second, until 2022, the TEC's denials were vague and arbitrary. Decisions were based on "security and care level" (2017) or "offense and conduct" (2018), and direction was given to "monitor and maximize hormones" (2018 and 2021) and comply with "all recommended programming and treatment" (2021). But Petitioner's hormone levels have been essentially "maximized" since she arrived at BOP, and there is no evidence that she has been noncompliant with any treatment regime or recommended programming. See also Resp't Ex. D at 23-26 (memo by Warden Pliler noting hormone maximization "for more than a year"). Although the TEC denials are opaque, Epplin testified that Petitioner's 1994 convictions for acts of sexual violence were a serious concern for the BOP. There is no evidence, however, that Petitioner has been violent or has sexually assaulted anyone while in custody or had engaged in any contact offenses for nearly 30 years. Petitioner testified that she completed the state sex offender program and voluntarily started taking Depo-Provera (i.e., chemically castrating herself) in 2015 to prevent such acts from reoccurring. Dr. Bowe diagnosed Petitioner's pedophilic disorder to be in remission. There is no evidence that these records were reviewed or considered. Additionally, Warden Pliler reported that Petitioner's disciplinary record is minor and described one infraction as "more stereotypical of a female facility and less stereotypical of a male medium facility." Resp't Ex. D at 25.

Third, in 2022, for the first time, the TEC denied Petitioner's transfer request because she declined sexual offender programming (SOMP). Despite multiple requests made to the TEC over

40

five years and multiple denials, the TEC had never before required Petitioner to complete SOMP before her transfer request would be considered. The evidence supports the Court's conclusion that this justification was manufactured because of this litigation. The 2022 TEC Manual does not require sex offenders to take SOMP before they can be transferred. The "likelihood of perpetrating abuse" is a factor that the TEC must evaluate, but it is evident that the TEC has not considered the *likelihood* of abuse, only *the fact* that she committed abuse 30 years ago. Had the TEC considered the likelihood of abuse, it would have found very little evidence: Petitioner's hormone levels are consistent with a woman's, and women are considered by BOP to be less likely to commit sexual assault; her pedophilic disorder diagnosis is in remission; she has not engaged in a contact offense since 1993; and, during her incarceration, she has had no incidents of violence or assault where she was the perpetrator (only the victim).

The TEC also did not consider that Petitioner has already completed a substantially similar sex offender program through Indiana's state court system in 2015. Although Petitioner committed the non-contact offense of distribution of child pornography around the same time, the TEC's failure to even inquire into this programming undermines the BOP's litigation position that SOMP participation is essential.

To the extent there is any validity to the requirement that Petitioner complete BOP's SOMP, there is no basis for requiring it to be done at a men's facility. Petitioner is recommended for residential programming (which is available only in men's facilities) based on the Static-99R. And Petitioner is evaluated on this diagnostic test because she has male genitalia. If she were evaluated as a woman consistent with her hormone levels and gender identity, she would be eligible for non-residential programming (which is available in women's facilities). Not only is the requirement that Petitioner complete residential programming arbitrary, it is also contrary to

best practices for people who have already successfully completed sex offender programming. Core to such graduates' successful rehabilitation is the need to *avoid* contact with sex offenders. Petitioner testified that she spent some time at FCI Marianna living in a sex offenders' unit and found it repulsive and triggering. Dr. Willert, the BOP's Sex Offender Programs Coordinator, acknowledged that placing Petitioner among people who would regularly discuss their offenses is clinically contraindicated.

On this record, the Court can draw only one conclusion: that the BOP has acted with deliberate indifference to Petitioner's serious medical needs in denying her transfer requests to a women's facility.

Finally, the BOP urges the Court to follow the decision in Fisher v. Federal Bureau of Prisons, No. 19-cv-1169 (SL), 2022 WL 2648950 (N.D. Ohio July 8, 2022). The Fisher court granted summary judgment to the BOP, finding that the denial of a transgender prisoner's transfer requests before she completed sex offender programming in a men's facility did not violate the Eighth Amendment. Id. at *16-17. That case was decided on facts that distinguish it from Petitioner's case, including that the Fisher plaintiff was convicted of a recent contact offense, began transitioning to become a woman after her incarceration, and was required to complete BOP sex offender treatment as part of her sentence. See id. at *2, *14-16. The Fisher court did not describe the kind of institutional support for transfer that Petitioner has presented.

Based on the documentary and testimonial evidence before me, I recommend that the Court hold that the BOP's refusal to transfer Petitioner to a women's facility violates her Eighth Amendment rights.

II.    **Validity of BOP's Refusal to Transfer Petitioner**

A.    **Legal Standard**

Where a prison regulation or decision violates a prisoner's constitutional rights, it is nevertheless "valid if it is reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89 (1987). The operative question is whether the decision is reasonably related to those objectives "or whether it represents an exaggerated response" to them. Id. at 87 (cleaned up). This standard reflects the fact that courts must afford prison administrators "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Bell v. Wolfish, 441 U.S. 520, 547 (1979).

To determine whether a prison decision that violates a constitutional right is reasonably related to a legitimate correctional objective, courts consider "whether the regulation has a 'valid, rational connection' to a legitimate governmental interest; whether alternative means are open to inmates to exercise the asserted right; what impact an accommodation of the right would have on guards and inmates and prison resources; and whether there are 'ready alternatives' to the regulation." Overton v. Bazzetta, 539 U.S. 126, 132 (2003) (quoting Turner, 482 U.S. at 89-91).

"Some of the Turner factors are a rough fit for this situation, as they focus on determining the constitutionality of regulations applicable to all inmates rather than the propriety of a particular prisoner's conditions of confinement." United States v. Bout, 860 F. Supp. 2d 303, 307 (S.D.N.Y. 2012). Nonetheless, I apply the Turner test to Petitioner's claim that she is being improperly housed in an all-male facility. In conducting this review, "deference is accorded to the BOP's determination," id., because "courts are ill equipped to deal with the increasingly

urgent problems of prison administration and reform," Turner, 482 U.S. at 84. But "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution," and "[w]hen a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights." Id. (second alteration in original) (quoting in part Procunier v. Martinez, 416 U.S. 396, 405-06 (1974), overruled on other grounds by Thornburgh v. Abbott, 490 U.S. 401 (1989)).

### B.    Application

The BOP analyzes the first and third Turner factors in tandem. It argues that keeping Petitioner in a men's facility is rationally connected to a legitimate penological interest because she is a sex offender who assaulted a 17-year-old girl in 1993 and sent two sexually explicit images of minors to her then boyfriend in 2015.[16] The claimed penological interest is in protecting female prisoners from sexual violence and trauma. This interest is obviously legitimate, but there are no signs that Petitioner is at risk of re-offending. The record is devoid of evidence of incidents of violence or assault during Petitioner's incarceration where she was the perpetrator (only the victim). The Wardens' memos to the TEC identify no serious infractions or raise any concern that Petitioner is likely to engage in inappropriate conduct. And, probably most significantly, Petitioner is a different person than she was in 1993. She is sober, under consistent mental health counseling and medication management, and has maximized and stabilized her hormones within the target ranges for transgender women. A theoretical risk of sexual assault by Petitioner, without more, cannot support the BOP's position. See Bout, 860 F. Supp. 2d at 310

---

[16] Of course, there are cisgender women convicted of sexual offenses who are housed in women's facilities. See Franca Cortoni et al., The Proportion of Sexual Offenders Who Are Female Is Higher Than Thought: A Meta-Analysis, 44 Crim. Just. & Behav. 145, 150 (2017) (calculating proportion of women sexual offenders in multiple countries including the United States).

(BOP failed to provide a legitimate purpose when it "produced no support" for its position and "relie[d] on pure speculation").

The BOP deems it "significant[]" that Petitioner declined SOMP when she first entered BOP custody in 2017. But the testimony establishes that Petitioner had just successfully completed state sex offender programming, and it is contraindicated for a recovering sex offender to have regular contact with people discussing their sex offenses. Petitioner testified that her brief time living in a sex offender unit at FCI Marianna was traumatizing. Finally, it was only five months ago that the TEC raised the bar to transfer and required Petitioner to complete residential SOMP before even being considered for transfer. The record reflects that since that decision, Petitioner has expressed an openness to such programming if it means she can live in a gender-affirming facility. See BOP Psychology Services Records at 8 (May 2, 2022 note that Petitioner "has started to express interest in SOMP").

The BOP also posits that permitting Petitioner to live among women will be traumatizing and possibly dangerous to them. This concern is overblown. Petitioner identifies as bisexual and her 1994 convictions were against both a male and female. She has not sexually assaulted anyone since 1993. Moreover, the hypothetical concern that Petitioner will hurt someone must be counter-balanced by the actual evidence that *she* has been assaulted and harassed in a men's facility. Finally, BOP has other measures to monitor prisoners and discipline inappropriate conduct short of exclusion from a housing designation that aligns with Petitioner's gender.

Apart from conclusory statements, the BOP puts forth no evidence that Petitioner has or would sexually assault other prisoners at a women's facility or that she poses a greater threat to women than that posed by any other prisoner. Though the Court grants deference to the BOP's determinations, the BOP cannot rely on tautologies to justify a restriction on Petitioner's rights.

The second <u>Turner</u> factor considers the availability of a feasible alternative for the prisoner to exercise the asserted right; the fourth similarly considers the availability of ready alternatives for the prison to accommodate the prisoner's asserted right. "[T]he absence of ready alternatives is evidence of the reasonableness of a prison regulation," but if a prisoner "can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." <u>Turner</u>, 482 U.S. at 90-91.

The BOP concedes that there is no alternative, short of transfer to a women's facility, that would vindicate Petitioner's constitutional rights. The BOP suggests instead that Petitioner's ability to "interact" with other transgender prisoners provides a "degree" of an alternative to living at a women's facility. The BOP provides little detail about the frequency or extent of these interactions, and according to Petitioner's testimony, there were only three peer group meetings for transgender prisoners at FCI Otisville during the four years that she was incarcerated there. Given that Petitioner has since been transferred to another BOP facility, there is no guarantee that she will continue to have even that opportunity.

The TEC has newly raised the need for Petitioner to complete SOMP before being transferred to a women's facility.[17] To the extent there is any validity to this requirement, Petitioner can complete this programming as a woman among other female sex offenders. The record demonstrates that if she did not have a male anatomy, her risk level would be appropriate for non-residential treatment, which is offered in women's facilities.

---

[17] At the time the BOP filed its opposition to Petitioner's petition, the TEC had last denied Petitioner's transfer request and recommended monitoring and maximizing hormones and compliance with "recommended programming" with no mention of SOMP. As such, BOP's brief does not address the new justification—that Petitioner complete SOMP—which the TEC only raised in February 2022.

The overwhelming evidence suggests that BOP's decision to deny Petitioner a transfer to a women's facility is based on bias and fear and not evidence. It is not reasonably related to the legitimate penological interest of protecting prisoners. The factors that the TEC is required to consider under the 2022 TEC Manual support her transfer, as does the evidence submitted by BOP staff, including three different wardens at FCI Otisville. And as discussed earlier, BOP's "accommodations" are not adequate to address Petitioner's serious medical needs. Accordingly, I conclude that the denial of Petitioner's transfer cannot be excused as an appropriate exercise of BOP's discretion.

## CONCLUSION

The BOP has violated Petitioner's Eighth Amendment rights by refusing to transfer her to a women's facility, and that refusal is not reasonably related to legitimate penological interests. I therefore recommend that the Court grant Petitioner's writ and order that she be transferred to a women's facility immediately.

SARAH NETBURN
United States Magistrate Judge

DATED:          August 3, 2022
                New York, New York

\*                    \*                    \*

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D), or (F)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Vernon S. Broderick at the United States Courthouse, 40 Foley Square, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Broderick. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).