UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------
JJS,

                            Petitioner                         19 Cv 2020 (VSB)(SDA)

v.

WARDEN J PETRUCCI**,**

                            Respondent.
------------------------------------------------------

**PETITIONER'S SUPPLEMENTAL MEMORANDUM IN FURTHER SUPPORT OF THE FIRST CLAIM IN PETITIONER'S AMENDED SUPPLEMENTAL PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241**

Jeffrey G. Pittell
Attorney for Petitioner, JJS
*Maher & Pittell, LLP*
42-40 Bell Blvd, Ste. 302
Bayside, NY 11361
(516) 829-2299
jp@jpittell.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------
JJS,

                          Petitioner                    19 Cv 2020 (VSB)(SDA)

v.

WARDEN J PETRUCCI,
                          Respondent.
-----------------------------------------------------

**PETITIONER'S SUPPLEMENTAL MEMORANDUM IN FURTHER
SUPPORT OF THE FIRST CLAIM IN PETITIONER'S AMENDED
SUPPLEMENTAL PETITION FOR WRIT OF HABEAS CORPUS
PURSUANT TO 28 U.S.C. § 2241**

## PRELIMINARY STATEMENT

Petitioner, JJS, by her undersigned counsel, submits this Supplemental Memorandum in further support of the First Claim (the "GAS Claim") in her Amended Supplemental Petition (the "Amended Petition") which seeks relief pursuant to 28 U.S.C. §2241 (ECF Doc. 33) and in response to the Court's Order dated February 26, 2025 (the "Order") (ECF Doc. 145).

This submission supplements all prior pleadings and proceedings in this matter including but not limited to: Petitioner's Reply Memorandum submitted in support of the Amended Petition ("Pet. Memo.") (ECF Doc. 46); the transcript of the hearing held before Chief Magistrate Judge Netburn (ECF Doc. 68, 70); the Exhibits introduced by the parties during a hearing held before Judge Netburn (ECF Doc. 137, 138); the Report and Recommendation issued by Judge Netburn (the "R&R") (ECF Doc. 74); and, the Order issued by Judge Broderick which adopted the R&R (ECF Doc. 86).

Based upon the reasons stated herein, and in the prior submissions, Respondent has violated the Eighth Amendment's prohibition against cruel and unusual punishment by acting with deliberate

indifference toward a serious medical need of JJS, specifically, by refusing to provide JJS with sex reassignment surgery, also referred to as gender affirming surgery ("GAS"), for gender dysphoria.

## JURISDICTION IS APPROPRIATE IN THIS COURT

The Order directed the parties to address the jurisdiction of the Court in this matter.

The Supreme Court holds that "whenever a §2241 habeas petitioner seeks to challenge his present physical custody within the United States, he should name his warden as respondent and file the petition in the district of confinement." *Rumsfeld v. Padilla*, 542 U.S. 426, 447 (2004). Following the proper filing of a §2241 habeas petition, in the district where the petitioner is incarcerated, the district court retains jurisdiction even if the petitioner is transferred to the custody of a different custodian in a different judicial district. *See, e.g., Middleton v. Schult*, 299 F. App'x 94, 95 n.1 (2d Cir. 2008) (summary order, *citing Francis v. Warden*, 894 F.2d 353, 354 (9th Cir. 1990)).

In the matter at bar, when the initial habeas petition was filed (ECF Doc. 2), JJS was in the custody of the Federal Bureau of Prisons (the "BOP") at its FCI Otisville facility located in the Southern District of New York. As such, jurisdiction properly attached to this District. Accordingly, jurisdiction remains within this District even though JJS has been subsequently transferred to, and is currently being held in, FMC Carswell in Texas.

**JJS IS ENTITLED TO HABEAS RELIEF ON THE GAS CLAIM**

**The Applicable Legal Standard**

Based upon the prior submissions of the parties, there appears to be an agreement on the applicable standard which must be met in order for JJS to be entitled to habeas relief on the GAS Claim.  ECF Doc. 46, Pet. Memo., p. 6; ECF Doc. 34, Resp. Memo., pp. 6-7.  In particular, the parties agree a two prong test must be applied wherein: 1) JJS must demonstrate she suffers from a serious medical condition requiring medical treatment; and 2) the Bureau of Prison has acted with deliberate indifference by not responding to this need.  *Id.*

The burden is on a petitioner to demonstrate a habeas claim by a preponderance of evidence.  *Murillo-Cabezas v. FCI Otisville Warden*, 2024 WL 3638331 (SDNY) ("because the habeas proceeding is civil in nature, the petitioner must satisfy his burden of proof by a preponderance of the evidence, *Skaftouros v. U.S.*, 667 F.3d 144, 158 (2d Cir. 2011)").

**The First Prong**

***JJS Suffers From Gender Dysphoria Which is a Serious Medical Condition***

A "serious medical condition" exists where "the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Id., citing Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir.1998).

Gender dysphoria is a serious psychological condition which requires medical and other treatment.  It is recognized as a serious psychological condition by the *American Psychiatric Association.  See, American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders* ("DSM 5") at 822 (Fifth Ed. 2013).

Federal Courts have also determined that gender dysphoria is a "serious medical condition." *See, e.g., Edmo v. Corizon, Inc.*, 935 F.3d 757, 769 (9th Cir. 2019) ("Gender dysphoria is a serious but treatable medical condition. Left untreated, however, it can lead to debilitating distress, depression, impairment of function, substance use, self surgery to alter one's genitals or secondary sex characteristics, self-injurious behaviors, and even suicide"); *Iglesias v. Fed. Bureau of Prisons*, 2021 WL 6112790, at *17 (S.D. Ill. Dec. 27, 2021) ("The parties agree that gender dysphoria is a serious medical condition, but they dispute whether Defendants were deliberately indifferent to Iglesias's gender dysphoria").

In the matter at bar, the medical and other records confirm JJS has been diagnosed with, and suffers from, gender dysphoria. *See*, ECF Doc. 37-2, p. 54 (medical records from *Eskenazi Women's Center for Excellence and Transgender Health* ("*Eskenazi*") stating JJS has a primary diagnosis of gender dysphoria); Exhibit Binder to this Memorandum, p. 1 (sample excerpt from JJS's BOP Medical Record stating JJS has been diagnosed with gender dysphoria)[1]; Exhibit Binder, pp. 2-7 (Memorandum from the BOP Medical Director to the Warden at FMC Carswell stating JJS suffers from "well documented gender dysphoria); and, ECF Doc 34, Resp. Memo., pp. 8-10 (acknowledging JJS suffers from gender dysphoria).

In addition, it has been previously adjudicated that gender dysphoria is a serious medical condition and that JJS suffers from this condition. *See, e.g.,* ECF Doc. 74, R&R, p. 2 (citing DSM 5 and stating gender dysphoria is a "serious medical condition" ) and R&R, p. 12 (stating JJS was

---

[1]
JJS's medical records are included in the record.  They contain numerous references to JJS being diagnosed with gender dysphoria.  In the interest of brevity, a single excerpt is attached.  In the event additional excerpts are needed, they will be provided.

diagnosed with gender dysphoria at age 51). Subsequently, the findings in the R&R were adopted in their "entirety" by Judge Broderick. ECF Doc. 86 (Order adopting the R&R). Thereafter, no appeal was taken by Respondent. Accordingly, it is "the law of the case" that JJS suffers from gender dysphoria which is a serious medical condition. *See, Ali v. Mukasey*, 529 F.3d 478, 490 (2d Cir 2008) (indicting the law of the case doctrine counsels a court against revisiting its prior rulings in subsequent stages of the same case absent cogent and compelling reasons such as an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.).

### JJS Requires GAS as Treatment for her Gender Dysphoria

The protocol for treatment of gender dysphoria has been promulgated by the *World Professional Association for Transgender Health* ("WPATH") which established, and updates, the *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People* (7th ed. 2011) (the "Standards of Care" or "SOC"). The Standards of Care "are the internationally recognized guidelines for the treatment of individuals with gender dysphoria." ECF Doc. 74, R&R, pp. 2-3 (indicating most court and major medical groups, including the American Medical Association, the Endocrine Society, the American Psychological Association, the American Psychiatric Association, the World Health Organization, the American Academy of Family Physicians, the American Public Health Association, the National Association of Social Workers, the American College of Obstetrics and Gynecology, and the American Society of Plastic Surgeons, recognize the SOC as promulgating the appropriate treatment for gender dysphoria). By adopting the R&R in its "entirety" this Court has adjudicated, and joined this consensus, that the SOC are the governing standard of care for gender dysphoria. ECF. Doc. 86, *see also*, BOP Transgender

Offender Manual, Program Statement 5200.08, p. 13 (citing the SOC as an additional resource for clinicians); ECF Doc. 34, Resp. Memo., pp. 10-11 (citing the SOC).

The SOC indicate the type of treatment for gender dysphoria differs from "person to person" and that each person must be assessed individually. ECF Doc. 74, R&R, p. 3, *citing*, SOC, pp. 9-10. The SOC "notes that while many transgender people find "comfort with their gender identity, role, and expression without surgery, for many others [GAS] is essential and medically necessary to alleviate their gender dysphoria." ECF Doc. 74, R&R, p. 3, *citing*, SOC, pp. 54, s*ee also*, ECF Doc. 34, Resp. Memo., p. 10 (acknowledging that GAS is a recognized treatment for GAS).

The R&R, and record in the matter at bar, confirm that JJS' form of gender dysphoria is severe and GAS is medically necessary.

Prior to her arrest, JJS' doctors at *Eskenazi* had already determined that GAS was medically necessary for treatment of JJS' gender dysphoria and proceeded to make the appropriate referrals. ECF Doc. 37-1, *Eskenazi* medical records, pp. 255, 277, ECF Doc. 37-2, *Eskenazi* medical records, pp. 15, 37-42,54-56 (collectively, containing references to JJS having GAS). These records indicate, the treatment providers at *Eskenazi* recommended providing GAS to JJS. Accordingly, they modified her hormone therapy plan in anticipation of it and submitted a request for insurance approval for the surgery. ECF Doc. 37-2, p. 41 (containing a note from JJS' primary care physician at Eskenazi, Dr. Janine Fogel, reporting that she "spoke with Dr. Salama [a psychiatrist at Eskenazi] who endorses tapering the provera and increasing the estraderm and sprionolactone and eventually an orchiectomy"); ECF Doc. 37-2, p. 15 (reporting JJS "is now receiving estrogen patch and has been referred for sex reassignment surgery pending insurance approval"). *See also*, Exhibit Binder, p. 9 (medical consultation from Dr. Hanna, dated May 7, 2024, stating "it is my opinion that patient

[JJS] would benefit from male to female gender reassignment vaginoplasty and bilateral breast augmentation").

Following JJS' incarceration, and following her transfer to a female prison, the BOP undertook its own carefully considered, multi-step, review process (based upon its established protocols) to determine whether GAS was medically necessary for JJS.

This process is outlined in the BOP Transgender Offender Manual ("TOM").  BOP Program Statement 5200.08.  For inmates seeking GAS, it provides:

> For transgender inmates in Bureau custody, surgery may be the final stage in the transition process and is generally considered only after one year of clear conduct and compliance with mental health, medical, and programming services at the gender affirming facility. Once that period elapses, an inmate may submit a request to his or her Warden requesting surgical consideration. The Warden will forward the request to the TEC. The TEC is the sole body who may determine that all milestones and individual goals for surgical consideration have been met. When this occurs, the case is referred to the agency's Medical Director for medical consideration. He or she may review existing records and/or interview the inmate, institution staff, and members of the TEC. After this individualized assessment, the Medical Director will determine if the surgery is medically appropriate for referral to a gender affirming surgeon. TOM, p. 9,

*See also*, ECF Doc. 35-2, Pedone Decl. Ex. 2 (indicating GAS is considered after an inmate has real life experience in the inmate's preferred gender).  Cognizant of this protocol, in order to provide the BOP with an opportunity to abide by it, following the transfer of JJS to a female facility, we requested litigation of the GAS Claim be stayed for one year.  ECF Doc. 94, 99.

Thereafter, after one year passed, by letter dated November 21, 2023, we initially requested the stay be lifted so the GAS Claim could be litigated.  ECF Doc. 102, 103, 104.  However, we subsequently agreed to hold this litigation in abeyance because the BOP appeared to be proceeding in good faith as the Warden at FMC Carswell forwarded JJS's request for GAS to the BOP Transgender Executive Council (the "TEC").  Following receipt of JJS's request for GAS, the TEC

agreed to review JJS's case and make its own determination of whether the milestones and individual goals for surgical consideration were met. ECF Docs. 114, 116, 133, 139 (Respondent's joint status letters to the Court updating the progress of the BOP's review of JJS's request for GAS). As indicated by these letters, following JJS residing in a female prison for a year, the BOP abided by its protocol set forth in the TOM -- for determining whether GAS was medically necessary -- by engaging in a multi step process which included:

1)    A review by the TEC was done to determine whether JJS's request for GAS was medically necessary for the treatment of her gender dysphoria.  Pursuant to this review, on November 29, 2023, the TEC determined GAS was medically necessary and approved JJS's request. ECF Doc. 114; Exhibit Binder, p. 2(Memorandum stating "The BOP Transgender Executive Council previously reviewed and determined Ms. Shelby met all administrative milestones for gender affirming surgery consideration").

2)    Thereafter, following the TEC's approval of JJS's request, pursuant to the TOM, JJS's case was then referred to the BOP Medical Director for medical consideration of whether GAS was medially necessary.  ECF Doc. 114; Exhibit Binder, p. 2 (Memorandum stating "The Executive Council referred the case to the BOP Medical Director for medical review and determination of medical appropriateness for potential gender affirming surgery and subsequent referral to a gender affirming surgeon").

3)    As part of the review by the Medical Director, on January 16, 2024, the BOP's Women and Special Populations Branch completed the TEC's surgical referral and submitted it to the Health Services Division ("HSD"). Following HSD's receipt of the referral, the Transgender Utilization Review Advisory Group ("TURAG"), began the process of utilization review to make a recommendation as to whether JJS was medically eligible for surgery. In connection with this review, the clinical providers at FMC Carswell, where JJS was located, were notified of the standard perioperative evaluations and letters needed to complete the review. As part of its review TURAG required letters from the psychological, psychosocial, and medical pre-operative teams. Over the course of two months, those letters were completed for JJS and submitted to TURAG for its review.

4)    On February 22, 2024, TURAG convened for its utilization review and had a visit with JJS. Pursuant to this review, TURAG recommended GAS.  Binder Exhibit pp. 4-7 (attachment to Memorandum with TURAG Recommendations stating "At this time, the TURAG recommends approval for evaluation by a gender affirming surgeon, in order for the patient to receive realistic outcome expectations and the details of the pre/peri/postoperative care of said procedures").

9

5)    On March 6, 2024, TURAG sent its recommendation to the Medical Director to make a final determination regarding Petitioner's request for GAS. ECF Doc. 114.

6)    During April 2024, the Medical Director determined GAS was medically necessary and approved JJS's request for GAS. ECF Doc. 116.  As a result the Medical Director issued a Memorandum to the Warden of FMC Carswell which, in pertinent part, stated, "An individualized comprehensive medical assessment was completed. Ms. Shelby has been approved to begin the surgical consultation process for gender affirming surgery, pelvic feminizing surgery, mastectomy, and tracheal shaving."  Exhibit Binder, pp. 2-3.

7)    Thereafter, a consultation with an outside gender affirming surgeon was scheduled for early May 2024.  ECF Doc. 116.  If the doctor approved JJS for surgery, then the BOP would endeavor to procure a contract with the doctor based upon this recommendation.  *Id.*  On or about May 6, 2024, JJS had an in person consultation with Dr. Dany Hanna, a surgeon outside of the BOP who specializes in providing GAS.   Exhibit Binder, pp. 8-11 (consultation report prepared by Dr. Hanna which is included in JJS's BOP medical records). Pursuant to this consultation, Dr. Hanna opined that GAS was medically necessary. Specifically, Dr. Hanna's consultation report states, "it is my opinion that patient would benefit from male to female gender reassignment vaginoplasty and bilateral breast augmentation." *Id., see also*, Letter dated July 16, 2024 sent by email to Magistrate Netburn from counsel for Respondent.

8)    Apparently, in response to Dr. Hanna's opinion, during July 2024, the BOP Field Acquisition Office released a solicitation for services (*i.e.*, requesting quotes from outside providers), in order to establish a contract with a surgeon to perform the GAS on JJS.  *See*, Letter dated July 16, 2024 sent by email to Magistrate Netburn from counsel for Respondent; and, ECF Doc. 133.  The solicitation period was open for approximately 90 days until October 2024. ECF Doc. 133.

9)    During October 2024, following the closing of the solicitation period, the BOP undertook a 60 day review period to evaluate the solicitations received by the BOP.  ECF Doc. 133.

10)   During December 2024, the BOP offered and entered into a contract with Dr. Hanna to be the medical service provider of GAS to JJS. ECF Doc. 140; Exhibit Binder, pp.12-13 (first two pages of the contract with Dr. Hanna and the BOP).

11)   Upon information and belief, during December 23, 2024, JJS had a final surgical consultation with Dr. Hanna.  Upon further information and belief, JJS was scheduled to undergo GAS during early February 2025.  *See also*, Exhibit Binder, p. 14 (excerpt from JJS's medical records indicating a target date of March 24, 2025 for JJS to have GAS).

Unequivocally, this thorough review -- which encompassed approximately two years -- demonstrates the BOP (collectively, including the TEC, HSD, TURAG and the Medical Director) carefully and, unequivocally, determined that JJS's form of gender dysphoria required GAS.

Based upon the foregoing, it is readily apparent the decision to provide GAS to JJS was not a "spur of the moment" decision. The BOP rarely finds that GAS is medically necessary. Generally, the BOP houses more than two thousand transgender inmates.[2] Prior to October 2021, it had never provided GAS to a single inmate. *Iglesias v. Federal Bureau of Prisons, et al*, 2021 WL 6112790 *1 (Dec. 27, 2021) (noting that until October 2021, the BOP never found that GAS was medically necessary for any past or present inmates). To date, we are aware of only two instances where the BOP provided GAS to inmates. One was to for an inmate who was in a prison, the other was for an inmate who was at a residential reentry center.[3]

Based upon the foregoing, there is a preponderance of evidence demonstrating the first prong, for habeas relief in the matter at bar, has been established.

---

[2] For example, March 2025 article in the *Arkansas Advocate* noted that, around the date of the article, the BOP was housing 2198 transgender inmates.
Source:
https://arkansasadvocate.com/2025/03/25/her-case-changed-trans-care-in-prison-now-trump-aims-to-reverse-course/#:~:text=A%202025%20government%20court%20filing,man%20in%20a%20men's%20facility.

[3] It is out understanding that Cristina Iglesias (who as at an RRC) and Donna Lagan (who was in prison) are the only two federal inmates to have received GAS.
Source:
https://justdetention.org/meet-the-pioneering-transgender-inmates-who-fought-for-gender-affirming-surgery-in-us-prisons/

**The Second Prong: The BOP has Acted With Deliberate Indifference**

Despite the foregoing, JJS did not undergo GAS. On January 31, 2025, the BOP intentionally cancelled the contract to provide GAS to JJS. ECF Doc. 141; Exhibit Binder, p. 15 (first page of amendment to contract indicating the contract was cancelled at the convenience of the Government). The timing and reasons for the cancellation unequivocally demonstrate the BOP acted with deliberate indifference in refusing to provide GAS to JJS.

The parties agree the standard for determining an Eighth Amendment violation, based upon a deprivation of in-custody care, is derived from the Supreme Court's holding in *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285 (1976). ECF Doc. 34, Resp. Memo., p. 6; ECF Doc. 46, Pet. Memo., p. 6. *Estelle* defines "deliberate indifference" to serious medical needs of prisoners as "the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285 (1976) (internal citation and quotation omitted). Elaborating on this definition, the Second Circuit holds "the deliberate indifference standard requires the plaintiff to prove that the prison official knew of and disregarded the plaintiff's serious medical needs." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir 1998) (*citations omitted*); *see also*, *Harrison v. Barkly*, 219 F.3d 132, 137-138 (2d Cir. 2000) (same). "Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir.1994). Deliberate indifference can be demonstrated "by something akin to recklessness, and does not require proof of a malicious or callous state of mind." *Charles v. Orange Cnty*, 925 F.3d 73, 87 (2d Cir. 2019). It can also be demonstrated by showing "the defendants should have known that failing to provide the omitted medical treatment would pose a substantial risk to the detainee's health." *Id.*

12

In the matter at bar, there is no dispute that the cancellation of the JJS's scheduled GAS contract was intentional and deliberate.  The amendment to the contract, dated, January 31, 2025, expressly states,  "In accordance with FAR 52.212-4(l), the Government hereby terminates Contract No. 15BFA025D00000002 for its convenience."  Exhibit Binder, p. 15.  Unequivocally, when the BOP cancelled the contract, it knew of JJS's serious medical needs.  The existence, and knowledge of, this serious need was the reason why the BOP entered into the contract to have GAS provided to JJS.  The seriousness and need is memorialized in the Memorandum from the BOP Medical Director to the BOP Warden at FMC Carswell which states JJS suffers from "well documented gender dysphoria."  Exhibit Binder, p. 2.  Unequivocally, the knowledge about the seriousness of JJS's medical condition -- which the BOP learned about through its prolonged evaluation process -- led the BOP to determine that, due to her gender dysphoria, JJS faced a substantial risk of harm if it was untreated and that GAS was the needed treatment.  Against this backdrop, the BOP knew or should have known that suddenly cancelling the GAS, for a non-medical reason, would pose a substantial risk to JJS's health.

Respondent has not formally disclosed the reason for the cancellation of JJS's GAS. However, undoubtedly, it was in response to an Executive Order issued by President Trump.  On January 20, 2025, President Trump issued an Executive Order entitled: DEFENDING WOMEN FROM GENDER IDEOLOGY EXTREMISM AND RESTORING BIOLOGICAL TRUTH TO THE FEDERAL GOVERNMENT (the "Executive Order").[4]

The Executive Order, at Section 4(c), states:

---

[4]https://www.whitehouse.gov/presidential-actions/2025/01/defending-women-from -gender-ideology-extremism-and-restoring-biological-truth-to-the-federal-government

> *The Attorney General shall ensure that the Bureau of Prisons revises its policies concerning medical care to be consistent with this order, and shall ensure that no Federal funds are expended for **any** medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex.* (Emphasis added).

Since the BOP cancelled the Contract eleven days after the issuance of the Executive Order, it is readily inferred the cancellation was deliberate and intentional in response to Section 4(c) of the Executive Order.

The language of the Executive Order is *per se* evidence of indifference. As indicated above, gender dysphoria is an indisputably recognized a medical/psychological condition which requires treatment. Nonetheless, the Executive Order has a blanket provision which mandates that no federal funds be used for "any" medical procedure, treatment or drug for the purpose of conforming an inmate's appearance to that of the opposite sex. Under this provision, given that treatment for gender dysphoria involves conforming a person's appearance to that of the opposite sex, the Executive Order prohibits the BOP from providing to provide any type of medical procedure, treatment or drug for gender dysphoria. As such, the Executive Order is deliberately indifferent to providing medical treatment for gender dysphoria.

Based upon the foregoing, there is a preponderance of evidence demonstrating the second prong, for habeas relief in the matter at bar, has been established.

## THE REMEDY

A federal prisoner may petition for habeas relief if she is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). "A writ of habeas corpus under §2241 is available to a federal prisoner who does not challenge the legality of his

sentence, but challenges instead its execution subsequent to his conviction." *Carmona v. U.S. Bureau of Prisons*, 243 F.3d 629, 632 (2d Cir. 2001) (*internal citations omitted*). Release from custody is an available remedy in §2241 habeas proceedings. *See e.g., Martinez v. McAleenan*, 385 F.Supp.3d 349 (SDNY 1019, Roman, D.J.) (granting writ of habeas corpus and ordering release of a person in ICE custody pursuant to §2241).

Here, release from custody is the only remedy. Pursuant to the Executive Order, the President of the United States has expressly ordered the BOP (a federal agency under the authority of the Executive Branch) to not provide any treatment for gender dysphoria, including GAS, to any inmate. Accordingly, pursuant to the Executive Order, JJS will not receive the needed treatment for her gender dysphoria. As a remedy, this Court cannot order the BOP to provide GAS to JJS as this order would direct the BOP to act in contempt of the Executive Order. As such, release from custody -- to enable JJS to procure GAS by her own means -- is the only available remedy.

Dated:      May 5, 2025
            Bayside, NY

                         Respectfully submitted,
                         /s/
                         Jeffrey G. Pittell
                         Attorney for Petitioner, JJS
                         *Maher & Pittell, LLP*
                         42-40 Bell Blvd, Ste. 302
                         Bayside, NY 11361
                         (516) 829-2299
                         jp@jpittell.com